Richard PLUGGE, Individually, and on Behalf of Arkansas
for Representative Democracy, and All Others Similarly
Situated *v.* W. J. "Bill" McCUEN, Secretary of State
Arkansans for Governmental Reform, Inc.

92-1074                                                   841 S.W.2d 139

Supreme Court of Arkansas
Opinion delivered October 20, 1992
[Supplemental Opinion on Denial of Rehearing
November 2, 1992.*]

Corbin, J., not participating.

*Friday, Eldredge & Clark*, by: *Robert S. Shafer* and *T. Wesley Holmes*, for petitioners.

*Winston Bryant*, Att'y Gen., by: *Jeffrey A. Bell*, Deputy Att'y Gen., for respondent Secretary of State.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *Sam Hilburn*, for intervenor-respondent Arkansans for Governmental Reform, Inc.

TOM GLAZE, Justice. Petitioners, the Arkansas Farm Bureau and a group known as Arkansas for Representative Democracy, filed this original action against the Secretary of State under

Amendment 7 to the Arkansas Constitution, attacking the sufficiency of the ballot title of the proposed Arkansas Term Limitation Amendment. On July 3, 1992, the sponsors of this proposed amendment filed their initiative petitions with the Secretary of State's office to get their measure on the 1992 General Election ballot. The Secretary of State eventually approved the signatures and ballot title submitted by the sponsors as sufficient, and on September 16, 1992, he certified the proposed amendment to appear on the General Election ballot. Petitioners filed this action on September 22, 1992, and Arkansans for Governmental Reform Inc. (AGR), supporters of the amendment, intervened in the case on September 24, 1992.

Petitioners contend the proposed amendment's ballot title is defective and misleading, and in doing so, argue significant parts and wording contained in the amendment are not, but should be, disclosed. The preamble reads as follows:

The people of Arkansas find and declare that elected officials who remain in office too long become preoccupied with reelection and ignore their duties as representatives of the people. Entrenched incumbency has reduced voter participation and has led to an electoral system that is less free, less competitive, and less representative than the system established by the Founding Fathers. Therefore, the people of Arkansas, exercising their reserved powers, herein limit the terms of elected officials.

Citing several cases, petitioners complain the first sentence of the preamble changes Arkansas's settled law that presumes elected officials act honestly, impartially and in good faith in the performance of their official duties. Next, they disagree with the use of the terminology "entrenched incumbency" in the preamble, saying that such language carries a negative connotation that fails to reflect those other voters who favor term limitation because they believe, put in positive vernacular, that the limitation will offer greater opportunity for other citizens to be involved in government. Petitioners also take exception to the preamble language that refers to our electoral system now being less free, less competitive and less representative, again explaining others who support term limitations do so for loftier reasons than the

ones expressed.

The rules of law governing sufficiency of the ballot title are well-settled. A ballot title must be (1) intelligible, (2) honest, and (3) impartial. *Leigh* v. *Hall*, 232 Ark. 558, 339 S.W.2d 104 (1960). It is not required that the ballot title contain a synopsis of the amendment or statute, but it should be complete enough to convey an intelligible idea of the scope and import of the proposed law. *Bradley* v. *Hall*, 220 Ark. 925, 251 S.W.2d 470 (1952). The ballot title must be free from any misleading tendency, whether of amplification, of omission, or of fallacy, and it must not be tinged with partisan coloring. The Attorney General's approval of a ballot title raises a presumption as to its sufficiency and only in a clear case should such an approval be held insufficient. *See Fletcher* v. *Bryant*, 243 Ark. 864, 422 S.W.2d 698 (1968). Finally, it is settled law that, in determining the sufficiency of a ballot title, this court must be liberal in construing the tenets of Amendment 7. *Finn* v. *McCuen*, 303 Ark. 418, 798 S.W.2d 34 (1990).

In considering petitioners' arguments in view of the foregoing rules, we are also met with those cases indicating that a preamble or title simply is not a part of a measure. *See McMahan* v. *Bd. of Trustees U. of A.*, 255 Ark. 108, 499 S.W.2d 56 (1973); *Roscoe* v. *Water and Sewer Imp. Dist. No. 1*, 216 Ark. 109, 224 S.W.2d 356 (1949); *Oliver* v. *Southern Trust Co.*, 138 Ark. 381, 212 S.W. 77 (1919). A title or preamble of an act is in no sense controlling, and is only properly considered if the act itself is ambiguous. *McMahan*, 255 Ark. at 110, 499 S.W.2d at 57.

Here, petitioners' concerns regarding the proposed amendment's preamble are misplaced. In fact, if the preamble had been included, some of its language may have raised more questions in voters' minds that it resolved. Clearly, the preamble is not a part of the text of the proposed amendment and for this reason alone, we hold its verbiage should not have been included in the amendment's ballot title.

Petitioners next claim the text of the proposed measure limits the state's executive officers to two four-year terms "in the same office," but the ballot title seems to limit an elected official to

two four-year terms in the Executive Department.[1] In addition, they argue the voters will be misled by the ballot title language "limiting the number of terms that may be served by members of the House of Representatives to three (3) two-year terms and "by members of the Arkansas Senate to two (2) four-year terms." In this respect, they complain the title does not reveal these legislative officials might run for representative or senator from a different district so as to avoid the limitations intended for such offices.

■ We fail to see any merit in petitioners' arguments. Obviously, the ballot title conveys the clear message that the terms of these designated offices are limited, and we are unable to say the language describing those terms is misleading. The title is not required to be perfect, not is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke.

Petitioners' most serious contentions concern questions surrounding the constitutionality or validity of the proposed amendments. They say that if the proposed Term Limitation Amendment is unconstitutional and invalid, the proposal would be misleading to the voters and should be stricken from the ballot or the votes cast on the measure should not be counted.

Petitioners first charge that the proposed amendment unlawfully provides that a senator or congressman who has served the specified number of previous terms "shall not be eligible to have his/her name placed on the ballot for election . . . ." Petitioners argue this language conflicts with the Standing Qualifications Clause of the Constitution of the United States. AGR responds stating, first, the measure is not a term limitation amendment, but if it is, second, Arkansas and its people acting as sovereign are within their right to enact such limitations. Third, AGR also claims this court should not reach this issue because, until the measure is passed, any opinion issued would be advisory in nature — a practice this court has steadfastly avoided. *Cozad* v. *State*, 303 Ark. 137, 792 S.W.2d 606 (1990); *Scott* v. *McCuen*, 289 Ark. 41, 709 S.W.2d 77 (1986). The Secretary of State joins

---

[1] Arkansas, of course, has seven separate constitutional officers in its Executive Department and each officer serves a four-year term without any limitations.

in AGR's second and third arguments.

Another argument bearing on the proposed amendment's validity is raised belatedly by the petitioners when they amended their original petition one day before reply briefs were due in this matter. Petitioners alleged the proposed measure does not contain an enacting clause as required by Amendment 7, and for this additional reason, the proposal should not be initiated. They assert the lack of an enacting clause creates confusion and uncertainty with regard to the precise text that is being proposed.

Both AGR and the Secretary of State object to petitioners raising this enactment issue, saying petitioners are unduly late. Citing ARCP Rule 15(a), they contend they are prejudiced by such unjustified tardiness. AGR and the Secretary of State argue, too, that no enactment clause is required of initiative amendments under Amendment 7, but if such clause is required, the proposed amendment contains a sufficient one.

■■ In trying to consider these constitutional challenges to the proposed amendment's validity, we are hampered by the fact that none of the parties have attached to or abstracted the amendment in their briefs. In original actions, the parties are required to file abstracts and briefs as in other cases. Ark. Sup. Ct. R. 17. We are aware by reading the parties' arguments that a copy of the amendment must have been attached as Exhibit A to the petitioners' original petition, but the petition or exhibit have not been abstracted. Even if the pleading and exhibit had been abstracted, apparently AGR in its answer denied such exhibit was an accurate copy of a part of the initiative petition, including the popular name, ballot title and the text of the amendment. Of course, AGR's answer also is not abstracted. Petitioners suggest the Secretary of State is competent to admit what petitioners alleged the proposed amendment provides, but for our purposes, to accept that suggestion does little to lay confusion to rest. The Secretary of State admits parts of petitioners' allegation, but denies that the proposed Term Limitation Amendment does not have a sufficient enacting clause. Also, as discussed above, both AGR and the Secretary of State argue Amendment 7 does not require an enacting clause for initiative amendments, and petitioners, considering time constraints, have been unable to respond to this argument. We simply decline to reach this issue at this time

with the confused, abbreviated state of the record being what it is. *See Czech* v. *Baer*, 283 Ark. 457, 677 S.W.2d 833 (1984).

█ Nor are we inclined at this stage to decide petitioners' constitutional challenge to the proposed amendment's provision that determines or limits a congressman's or senator's eligibility to appear on the ballot after having served specified terms. As mentioned earlier, both the Secretary of State and AGR point to a long line of cases where this court has stated that it will not issue advisory opinions.

Petitioners, on the other hand, urge that, if a part or section of the proposed amendment conflicts with the· Qualifications Clauses of the United States Constitution, it is this court's duty under Amendment 7 to enjoin placement of the amendment on the ballot because voters will not be aware of the constitutional issue involved and would be misled to believe the Amendment, if adopted, would be a validly enacted state law. Petitioners rely in part on the case of *Czeck*, 283 Ark. 457, 459, 677 S.W.2d 833, 835, for the proposition that, under Amendment 7, the validity of a proposed measure may be considered and decided, when it is properly raised, before the election.

█ We note again that the proposed amendment and the parties' pleadings are not abstracted for our review, making it difficult to follow the parties' argument. In addition, our reading of *Czeck* reflects the binding-arbitration ordinance involved there was clearly contrary to law and should not have been submitted to the electorate. Whether the proposed amendment here contravenes the Qualification Clauses is not as clear, and as a consequence, we are not convinced the amendment should be stricken from the ballot.

In taking a different view, the dissenting opinion relies in part on a 1912 case, *Hodges* v. *Dawdy*, 104 Ark.. 583, 149 S.W. 656 (1912), which dealt with an initiated special statute that would have served to move the county seat from Fordyce to Princeton. The *Hodges* case was decided under prior initiative and referendum law that existed *before* the adoption of Amendment 7. In addition, that case did not involve an issue under the Federal Constitution. In either circumstance, the *Hodges* case is not precedent in this case.

Petitioners cite the recent case of *Stumpf* v. *Lau*, 1992 W.L. 23548 (Nev.) (Sept. 18, 1992), as authority that such term

limitation initiatives are unconstitutional and should not appear on a state's ballot. *Stumpf* is a split decision which certainly provides no clear-cut answer to the issue here. In fact, in a well-reasoned opinion, the dissenting justices offered considerable research and thought before concluding they believed an initiative measure, placing limits on congressmen and senator terms, should be placed on Nevada's ballot. *See, e.g.,* Troy Andrew Eid and Jim Kolbe, *The New Anit-Federalism: The Constitutionality of State-Imposed Limits on Congressional Terms of Office,* 69 U. L. Rev. 1, 8 (1992), and Roderick M. Hills, Jr., *A Defense of State Constitutional Limits on Federal Congressional Terms,* 53 U. Pitt. L. Rev. 97 (1991).

Undoubtedly, a strong case can be made concerning the Term Limitation Amendment's invalidity both under Arkansas's and the United States' Constitutions, and voters should be aware that their votes for or against this measure may ultimately have value only as an expression of public sentiment on the subject. In short, a future judicial proceeding will be required to decide the Amendment's validity if it is adopted by the people. If that occurs, the constitutional arguments posited here will then be placed squarely before us and can be decided after due and proper consideration.

For now, we hold the ballot title is sufficient and deny petitioners' request to remove the Term Limitation Amendment from the ballot. An immediate mandate shall issue.

Corbin, J., not participating.

Robert H. Dudley, Justice, dissenting. Petitioners filed this original action pursuant to Amendment 7, the Initiative and Referendum Amendment, to the Constitution of the State of Arkansas seeking to enjoin the respondent Secretary of State from placing the proposed "Term Limitation Amendment" to the state constitution on the ballot for the November 3, 1992, general election. At this time, the respondent has placed the issue on the ballot and absentee voting has commenced. Thus, the only relief now available to petitioners is for this court to order that the votes not be counted or considered. I would grant such relief because one part of the proposed amendment is in violation of the Standing Qualifications Clause of the Constitution of the United

States, and there is no way this court can excise the unconstitutional part of the proposed state constitutional amendment. When a proposed initiated measure is unconstitutional, it is the duty of this court to enjoin its submission to the people.

I. Duty of This Court

In *Hodges* v. *Dawdy*, 104 Ark. 583, 149 S.W. 656 (1912), a decision under our prior, but comparable, Initiative and Referendum Amendment, we construed the amendment and the enabling act in existence at that time and concluded that it was the duty of this court to examine the constitutionality of a proposed amendment. The enabling act that we construed in that case is the same in all material parts as the current act, Ark. Code Ann. § 7-9-112 (1987). In that case, the petitioners sought a writ of mandamus to force the Secretary of State to place an unconstitutional proposal on the ballot. We refused and wrote:

> The act clearly makes it the duty of the court, on an application for mandamus, to inquire whether the proposed measure falls within the terms of the Constitution as if amended, and, if it does, to compel submission to the people; otherwise to restrain the submission of it to the people. It follows, therefore, that, unless it be found that the measure proposed by the plaintiffs is subject to the initiative power of the people, and that the petition is legally sufficient, according to existing laws, the Secretary of State cannot be compelled to file it and certify the measure out for submission to the people.

*Id.* at 591, 149 S.W. at 659.

The opinion in that case set out the language of the then current Initiative and Referendum Amendment under which the people *"reserved"* to themselves the power to amend the state constitution. The present Initiative and Referendum Amendment, Amendment 7, contains the same provision:

> The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people *reserve* to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls. . . .

The first power *reserved* by the people is the initiative. [Emphasis added.]

The amendment does not confer power; it reserves power. Because the people of this State have never had the power to enact a law contrary to the United States Constitution, they could not reserve such a power. *Hodges* v. *Dawdy, 104 Ark. at 595, 149 S.W. at 660-61. For that reason, we expressly stated that if a proposed measure is unconstitutional it should not be placed on the ballot. Id.* That reasoning is just as valid today as it was then.

In *Dust* v. *Riviere*, 277 Ark. 1, 4, 638 S.W.2d 663, 665 (1982), we defined the scope of our Initiative and Referendum Amendment as: "The voters of this state essentially have, *within constitutional limits*, a right to change any law or any provision of our Constitution they deem appropriate through Amendment 7 to the Constitution." [Emphasis added.]

In *Czech* v. *Baer*, 283 Ark. 457, 677 S.W.2d 833 (1984), a case squarely on point, the city clerk refused to certify two initiated measures to the election commission because the city attorney doubted the validity of the measures. Suit was filed and the circuit court held that the clerk had improperly exercised her authority, and issued a writ of mandamus. The city appealed and, in reversing and holding the matter should not be placed on the ballot, we wrote:

> At the outset the appellees argue that we should permit the measures to be placed on the ballot without first determining their validity. Certainly it is true that a party who resists an initiated petition on grounds such as insufficiency of signatures or improper ballot title is not required to question the validity of the proposed measure. On the other hand, that question may be considered and decided when it is properly raised, even before the election. *Proctor* v. *Hammons*, 277 Ark. 247, 640 S.W.2d 800 (1982); *Hodges* v. *Dawdy*, 104 Ark. 583, 149 S.W. 656 (1912).

We then held that one of the measures was invalid and ordered that it *"not be submitted to the electorate, or, to the extent that such a directive may be too late to be effective, that the votes not be counted or considered."*

In *Proctor* v. *Hammons*, 277 Ark. 247, 640 S.W.2d 800 (1982), we wrote:

> Appellants argue that Amendment 7 to the Constitution, providing for Initiative and Referendum, prohibits a referendum by a municipality or county when such initiative or referendum is contrary to the constitution or any general law of the state. We agree with this statement of the law.

*Id.* at 250, 640 S.W.2d at 802. We then held that the proposal did not violate state law.

It is axiomatic that there is no power reserved in the people to initiate a state proposal that is in violation of the federal Constitution, and that under our prior interpretations of Amendment 7 and its enabling statutes we will enjoin such an unconstitutional proposal. This construction of the statute and of Amendment 7 has become "as much a part of the statute as if written in it." *Merchants Transfer and Warehouse Co.* v. *Gates*, 180 Ark. 96, 21 S.W.2d 406 (1929). If *stare decisis* were not a controlling precept of statutory construction, this court would, in effect, be sitting as a second General Assembly. *See Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977).

The intervenors, who are the sponsors of the proposal, argue that we should not determine the constitutionality of the proposal because we would be issuing only an advisory opinion and we do not issue mere advisory opinions. The majority opinion adopts that specious rationale. Many times we have said that we will restrain a ballot title, or proposed issue, that misleads the voters. Each of the cases cited above is authority that a justiciable controversy exists at the time of certification, and not just after the people have voted. It is incongruous to think that this court must wait to act until after voters have been misled. The intervenors also suggest that we should wait until the Supreme Court of the United States decides the issue. Again, the argument may at first blush seem attractive, but is not so in reality. State courts frequently must decide issues that are governed by the United Stated Constitution, and at times they must do so before there is a decision by the Supreme Court. A large percentage of our criminal cases are governed by federal issues, and at times we must decide such an issue before the Supreme Court rules on

some particular constitutional aspect of the criminal law. For example, this court had to decide initially whether "death qualified" juries violated a defendant's Sixth Amendment right. We held that such juries were constitutionally valid. *Rector* v. *State*, 280 Ark. 385, 659 S.W.2d 168 (1983). A federal district court and a sharply divided circuit court of appeals held to the contrary, *Grigsby* v. *Mabry*, 569 F. Supp. 1273 (E.D. Ark. 1983) and *Grigsby* v. *Mabry*, 758 F. 2d 226 (8th Cir. 1985), and eventually the question was decided by the Supreme Court, and it agreed with the result of our holding. *Lockhart* v. *McCree*, 476 U.S. 162 (1986). Thus, at times, it is necessary for us to decide federal constitutional issues before the Supreme Court does. In sum, our cases and our dual court system require that we decide whether the proposed amendment is constitutionally valid, and I dissent from the majority opinion's refusal to do so.

The result of this case is incongruous in still another manner. We have a litany of cases which recite that the popular name or ballot title of an initiated proposal must not be misleading. *See, e.g., Leigh* v. *Hall*, 232 Ark. 558, 339 S.W.2d 104 (1960). We have often said a ballot title or popular name must be "honest." *See, e.g., Arkansas Women's Political Caucus* v. *Riviere*, 283 Ark. 463, 677 S.W.2d 846 (1984). Yet, under the precedent of the majority opinion, the unfair political device of "logrolling" is authorized. A hypothetical example is as follows: Suppose a political action group wanted to propose an initiated act that required judges, rather than juries, to fix sentences for convicted felons, but the group knew that the voters would be reluctant to take sentencing of criminals away from the citizens. The group would add to the proposed initiative a provision that criminals could not take the Fifth Amendment. This second provision, even though blatantly unconstitutional, might be popular enough to give the sentencing part of the "criminal procedure" initiative enough votes to pass. Under today's precedent, this court could not hear a contest of the issue, and the public would be mislead into voting for the sentencing provision.

In addition, the result of the majority opinion seems unfair to both the supporters and opponents of the current proposal and to those elected officials who might be affected. Both sides must now spend resources on the issue, and that is an unnecessary waste of those resources. The proponents of the proposed amendment

must campaign under the cloud of constitutional invalidity. If the measure passes, incumbent office holders will have to campaign under the cloud of ineligibility and then those individuals might have to bear the expense of a lawsuit. I would not leave both sides in such suspension. Instead, I would follow our cases and decide the issue.

## II. Validity of the Term Limitation Amendment.

The proposed amendment to the state constitution is invalid for three basic reasons. First, a review of the long history of term limitation compels the conclusion that the framers rejected the idea in drafting the Constitution. Second, the imposition of term limitations upon members of the United States Senate and the House of Representatives would add a qualification not mentioned in the Constitution — lack of incumbency — to the membership requirements that are fixed by the Constitution and the several states do not have this power. Third, allowing a several state to create qualifications for national officeholders is antithetical to both the supremacy concept and to republican values.

The American Colonists were well aware of the shortcomings of the "imperial parliament" of King George III, for they were its victims. They knew that the House of Commons existed in name only and that the vast majority of the British people would be denied membership even if elected because of the House of Commons self-proclaimed right to refuse to seat even duly elected members without justification. Eid & Kolbe, *The New Anti-Federalism: The Constitutionality of The State-Imposed Limits on Congressional Terms of Office*, 69 Denv. U. L. Rev. 1, 8 (1992). A reform movement in England in the early 1770's sought to limit the seven-year parliamentary session. *Id.* at 11. George III consolidated his power and the reform movement languished, but the failure of that reform movement had profound consequences for the Colonists, not just in forming our own country, but in some of the governing provisions. *Id.*

*In 1777, the Articles of Confederation limited congressional delegates to three years of service, and by 1784 a handful of members were ineligible for re-election.* Rakove, *The Beginnings of National Politics: An Interpretative History of the Continental Congress* 218 (1979); Eid & Kolbe, *supra*, at 12. *The*

*Constitution, which replaced the Articles of 1789, did not incorporate any term restrictions on incumbency.* This was not some mere inadvertent omission. Term limits were discussed over a period of years and were discussed in detail in the closed-door negotiations at the Convention in Philadelphia, and these discussions were replayed in the public press. Eid & Kolbe, *supra*, at 13.

The original draft of the Constitution, the so-called Virginia Plan offered by Edmund Randolph, declared U. S. Representatives "to be incapable of re-election for the space of ____ after the expiration of their term of service. . . ." James Madison, Notes of Debates in the Federal Convention of 1787, *in The Anti-Federalist Papers and The Constitutional Convention Debates*, at 37 (Ketcham ed. 1986).

The campaign against ratifying the Constitution was already underway when the Convention met in May 1787. The Anti-Federalists publicly condemned the proposed Constitution for its failure to forbid incumbent members of Congress from seeking re-election. The Anti-Federalist pamphleteer Cincinnatus argued that Senators, like the President, should be limited to a single term. Cincinnatus, *Anti-Federalist No. 64 In The Anti-Federalist Papers* 188 (Martin Borden ed. 1965) cited in Eid and Kolbe, *supra*, at 15. Elbridge Gerry of Massachusetts argued both at the Convention and in the press that unless congressional terms were limited, nothing could prevent "the perpetuity of office in the same hands for life." Gerry, *Replies to the Strictures of 'A Landlord'* (1787) quoted in Eid & Kolbe, *supra*, at 15. *See also* Smith, Speeches of Melancton Smith *in The Anti-Federalist Papers*, supra, at 350. It is striking that these critics understood the Constitution to exclude term limits for members of Congress. There is no indication that they believed the states retained the power to impose such restrictions on federal officeholders. On the contrary, when William Findley urged the citizens of Philadelphia to reject the proposed Constitution, he lamented: "Rotation, that noble prerogative of liberty, is *entirely excluded from the new system of government* and the great men may and probably will be continued in office during their lives." [Emphasis added.] William Findley, Letter of an Officer of the Late Continental Army, Nov. 3, 1787 quoted in Eid & Kolbe, *supra*, at 16. Findley, like others in the Anti-Federalist camp, believed the Constitution

was flawed because the republic it created "entirely excluded" term limitation, not just for the office of President, but for members of Congress as well.

On the other side, the Federalists also thought that the members of the United States Senate and House of Representatives would be eligible for re-election under the new system of government. In *The Federalist No. 53*, James Madison not only predicted that some House members would be returned to office repeatedly, but argued that their re-election would benefit the institution as a whole:

> A few of the members, as happens in all such assemblies, will possess superior talents; will by frequent re-elections, become members of long standing; will be thoroughly masters of the public business, and perhaps not unwilling to avail themselves of those advantages. The greater the proportion of new members, and the less the information of the bulk of the members, the more apt will they be to fall into the snares that may be laid for them.

*The Federalist No. 53*, at 335 (James Madison) (Rossiter ed. 1961).

In *The Federalist No. 60,* at 371 (Rossiter ed. 1961), Alexander Hamilton noted that Congress's membership qualifications "are defined and fixed in the Constitution, they are unalterable by the legislature."

Madison wrote that the minimal requirements of age, residency, and citizenship were to be the sole criteria for congressional service, as follows:

> Who are to be the objects of popular choice? Every citizen whose merit may recommend him to the esteem and confidence of his country. No qualification of wealth, of birth, of religious faith, or of civil profession, is permitted to fetter the judgment or disappoint the inclination of the people.

*The Federalist No. 57*, at 351 (James Madison) (Rossiter ed. 1961).

Refusing to disqualify incumbents from re-election was consistent with the Federalists' overreaching vision of Congress

as a national legislature that would do something more than simply represent state and local interests, as the Continental Congress had done under the Articles. The Federalists recognized the possible dangers of congressional incumbency, but decided that the benefits in the form of institutional stability and expertise outweighed the risks. They concluded that the corrupt tendencies of individual incumbents could be controlled by requiring all federal legislators to face their electors with reasonable frequency. Eid & Kolbe, *supra*, at 17.

The Convention debate over two-year and six-year terms for Representatives and Senators, respectively, was reminiscent of that which had taken place in England a few years earlier over limiting the duration of parliamentary terms. Indeed, in rejecting the Anti-Federalists' claim that "where annual elections end, tyranny begins," Madison contrasted the Constitution's biennial elections for Representatives with the seven-year sessions of the British House of Commons:

> As it is essential to liberty that the government in general should have a common interest with the people so it is particularly essential that . . . [the House of Representatives] should have an immediate dependence on and an intimate sympathy with, the people. *Frequent elections are unquestionably the only policy by which this dependence and sympathy can be effectually secured.* But what particular degree of frequency may be absolutely necessary for the purpose does not appear to be susceptible of any precise calculation. . . . [I]f we may argue from the degree of liberty retained even under septennial elections, and all the other vicious ingredients in the [British] parliamentary Constitution, we cannot doubt . . . that biennial elections, under the federal system, cannot possibly be dangerous to the requisite dependence of the House of Representatives on their constituents.

*The Federalist No. 52*, at 327-28 (James Madison) (Rossiter ed. 1961) (emphasis supplied).

As the convention drew to a close, the Anti-Federalists' campaign for term limitation foundered. Randolph's Virginia Plan expressly limited Representatives to a single term, but the delegates voted to eliminate this provision. Gerry and others

demanded term limits for Senators, but they too were unsuccessful. Later Convention debates further indicate that both the Federalists and the Anti-Federalists understood the final draft of the Constitution to exclude term limits for members of Congress. Eid & Kolbe, *supra*, at 19.

The founders' perspective of the matter of term limits for the members of Congress was settled. Those who argue, as do the intervenors in this case, that the founders failed to speak on this issue simply must deny the thoroughness and decisiveness of the term limit debate, and they must deny that the founders deliberately rejected term limits for Congress.

After failing to enact congressional term limits in the text of the original Constitution, Anti-Federalists tried to include such restrictions in the Bill of Rights. When the first Congress convened in 1789, Representative Thomas Tucker of South Carolina introduced term limitation proposals for both the Senate and the House. *1 Annals of Cong.* 790 (Joseph Gales ed. 1789) cited in Eid & Kolbe, *supra*, at 21. The House never voted on either of the measures.

The intervenors argue that the Constitution does not expressly prevent a state from imposing such a restriction; that the Tenth Amendment, a part of the Bill of Rights, provides that "[t]he powers not delegated to the United Stated by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People;" and, therefore, the State has retained the power to limit terms through the Tenth Amendment. The architects of the Constitution plainly intended the opposite result. From the outset Madison and his allies were determined that the Standing Qualifications Clauses contained in Article I, Sections 2 and 3 would be the *exclusive* list of qualifications for congressional service. Those sections provide: "No person shall be a representative who shall not have attained the age of twenty-five years, and been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of that state in which he shall be chosen," and, "No person shall be a senator who shall not have attained to the age of thirty years, and been nine years a citizen of the United States, and who shall not, when elected, be an inhabitant of the state for which he shall be chosen." *The imposition of term limitations without a federal*

*constitutional amendment would add an unenumerated qualification—lack of incumbency—to the membership requirements that are fixed by the Constitution.*

The founders' decision to make the Standing Qualifications Clauses the sole criteria for congressional membership is especially striking given their insistence that states be allowed to set their own restrictions on who could vote in federal elections. Article I, Section 2 provides that "the electors of each State shall have the Qualifications requisite of the most numerous branch of the State Legislature." The states have frequently used this power to disqualify women, blacks, and others from voting while enforcing minimum property ownership requirements reminiscent of those in England. In contrast, *the Constitution says nothing about letting states impose similar qualifications on federal officeholders.* This silence was the product of one of the founders' greatest debates: whether to restrict service in the national legislature to an elite few. The majority of delegates chose to reject an array of proposed membership qualifications—mostly pertaining to wealth—before approving the relatively minimal standing qualifications of age, residency and citizenship that are found in Article I. Eid & Kolbe, *supra*, at 23. A clear understanding of the founders' intentions leads to the inescapable conclusion that additions to the Standing Qualifications Clauses can be achieved only by amending the text of the Constitution, as was done with the twenty-second Amendment, which limits the President to eight years of service.

In the two centuries since the Philadelphia Convention, both Congress and the Supreme Court have generally construed the Standing Qualifications Clauses to be the exclusive list of membership requirements for members of Congress. In *Powell* v. *McCormack*, 395 U.S. 486 (1969), the Supreme Court held that Congress could not exclude a duly elected member of Congress who otherwise satisfies the age, residency, and citizenship requirements contained in Article I. The Court based its decision on an exhaustive review of the "relevant historical materials." *Id.* at 522. These materials were not limited to qualifications created by Congress. Rather, the Court also cited the John Wilks case and the Convention debates, to support its expansive conclusion that the standing qualifications are fixed by the Constitution. The case makes it clear that Congress cannot impose restrictions, beyond

those contained in Article I, upon its membership without violating the Standing Qualifications Clauses. The holding should apply with equal force to the states.

While the Supreme Court has not squarely addressed the issue of restrictions in addition to those of age, residency and citizenship, the House of Representatives addressed the issue in a membership dispute over an 1802 Maryland state law that added an additional residency requirement. Although the final House resolution did not contain a report giving the reason for its vote, the overwhelming majority of House members felt that the additional residency requirement violated the Constitution. *See* Eid & Kolbe, *supra*, at 33 - 38. Various reasons were advanced: Allowing a state to create qualifications for national officeholder was antithetical to both federal supremacy and republican values; members of Congress were federal officers, not merely agents of the states; when a state claims the right to restrict the franchise in a federal election it constitutes a direct violation of the federal constitutional supremacy; and the founders formed not a government of states, but a national government of the people.

Thomas Jefferson was uncertain whether the House's decision meant that the states were absolutely forbidden to impose qualifications on their federal representatives. Letter form Thomas Jefferson to Joseph C. Cabell (Jan. 31, 1814) in Eid & Kolbe, *supra*, at 40. He thought that the Standing Qualifications Clauses could plausibly be understood as the minimum, but not exclusive, set of requirements for congressional service when read in light of the Tenth Amendment. Jefferson's doubts about the House's decision were in turn questioned by Justice Joseph Story, one of the greatest constitutional scholars of the era. He explained that it was the Constitutional Convention, and not the states, that created the national government. Consequently, Congress' authority can only come from the Constitution itself. Like other federal officeholders, members of Congress owe their existence to the people, whose delegates created the Constitution. He wrote:

> The truth is, that the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the Constitution does not delegate to them. They have just as much right, and no more, to prescribe new qualifications for a representative,

as they have for a president. Each is an officer of the Union, deriving his powers and qualifications from the Constitution, and neither created by, dependent upon, nor controllable by, the states. It is no original prerogative of state power to appoint a representative, a senator, or a president for the Union. Those officers owe their existence and functions to the united voice of the whole, not a portion of, the people. Before a state can assert the right, it must show, that the Constitution has delegated and recognized it. *No state can say, that it has reserved, what it never possessed.*

Joseph Story, *2 Commentaries on the Constitution* § 626 (Rothman ed. 1991) (emphasis added).

The intervenors in this case also argue that the Times, Places and Manner Clause of Article I, Section 4, which permits states to establish the procedures for electing Senators and Representatives, permits states to prevent incumbents from seeking reelection. The argument is based on a subtle, and perhaps beguiling, difference between the proposed ballot title and the text of the proposed amendment. The ballot title is *"Term Limitation* Amendment," but the full text of the proposal does not limit terms as such. Instead, it states that a Senator or Congressman who has served the specified number of previous terms "shall not be eligible to have his/her name placed on the ballot for election . . . from Arkansas." Thus, the intervenors argue that theirs is not a term limitation amendment, but instead is merely a procedure for electing members of Congress, and, therefore, may be governed by the state under the Times, Places and Manner Clause.

The argument is based upon the fallacious assumption that the Standing Qualifications Clauses are not the exclusive criteria for Congressional service. Moreover, it is beyond doubt that the Times, Places and Manner Clause lets states regulate the procedural machinery of federal elections, but it does not empower states to deny congressional membership to persons who otherwise meet the requirements of the Standing Qualifications Clauses. The Standing Qualifications Clauses are substantive rules, defining who is eligible to serve in Congress. In contrast, the Times, Places and Manner Clause allows states to draft the procedure for their election. These clauses are part of a coherent

design; each must be read in the context of the other. The intervenors' interpretation would destroy their syntax.

Parenthetically, if a candidate were qualified under the Standing Qualifications Clauses, but his name could not be placed on the ballot, he could run only as a write-in candidate. In *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983), the Court footnoted that the opportunity for write-in votes "is not an adequate substitute for having the candidate's name appear on the printed ballot."

In conclusion, the idea of term limitations is not new. It was discussed in England and in the colonies. The Articles of Confederation limited congressional delegates to three years of service. The concept was debated during the Constitutional Convention and also during the subsequent period of ratification. The historical evidence is overwhelming that the requirements for membership in Congress are those set out in the Standing Qualifications Clauses. No other requirements can be validly added by individual states. Thus, the proposed "Term Limitation Amendment" is unconstitutional.

I dissent from the majority opinion, which holds that a state constitutional amendment that is in violation of the federal Constitution should be allowed to remain on the ballot.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
NOVEMBER 2, 1992

*Friday, Eldredge & Clark*, by: *Robert S. Shafer*, and *T. Wesley Holmes*, for petitioners.

*Winston Bryant*, Att'y Gen., by: *Jeffrey A. Bell*, Deputy Att'y Gen., for respondent Secretary of State.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *Sam Hilburn*, for intervenor-respondent Arkansas for Governmental Reform, Inc.

PER CURIAM. Petitioners' petition for rehearing is moot since immediate mandate was issued when this court's opinion was handed down. This procedure is followed in election cases because time constraints preclude ordinary briefing and motion schedules.

This per curiam will not consider the merits of the matter, but addresses only the procedural matter contained in petitioners' rehearing petition and their suggestion that Rule 17 was invoked by the majority court in an uneven manner. Actually, it was the petitioners' burden, not the respondent's or intervenor's, to show error. Whether respondent or intervenor abstracted any part of the record does not eliminate petitioners' duty to do so.

Even though petitioners failed to abstract the proposed amendment, the court did its best to address all of the petitioners' issues, and in fact, reached them all except the two bearing on the proposed measure's validity. The alternative was to dismiss petitioners' case without reaching any of their issues. We avoided such choice.

Considering the text of the proposed measure was in question when determining its validity, the court obviously was hampered in reviewing the two issues urged by the petitioners and argued by all parties. In sum, the court, while not required to do so, reached every issue it could reasonably address with the proposed amendment not having been abstracted, as is clearly required under Rule 17. In sum, we accepted much set out in the argument of petitioners' brief which was not supported by an abstract in order to reach issues in this case because it was one of public significance.

Finally, we would note that the court did not reach the merits of the proposed amendment's validity for two reasons, not one. As clearly stated, the court, too, declined to offer an advisory opinion on the constitutionality of the proposed measure. The court chose not to be rushed to a decision on a serious issue where no clear or compelling precedent had been offered showing the proposed measure's unconstitutionality. This reason, of course, had nothing to do with any failure to abstract the record.

Corbin, J., not participating.