Mr. Ryan Denham, Campaign Director Arkansans for Compassionate Care Post Office Box 692 Fayetteville, Arkansas 72702
Dear Mr. Denham:
This is in response to your request for certification, pursuant to A.C.A. § 7-9-107 (Repl. 2007), of the following popular name and ballot title for a proposed initiated measure, as follows:
 Popular Name AN ACT TO ALLOW QUALIFYING PATIENTS IN ARKANSAS TO ACQUIRE AND USE MEDICAL MARIJUANA
 Ballot Title AN ACT MAKING THE MEDICAL USE OF MARIJUANA LEGAL AND ESTABLISHING A SYSTEM FOR THE CULTIVATION AND DISTRIBUTION OF MARIJUANA FOR PATIENTS THROUGH NONPROFIT MEDICAL MARIJUANA DISPENSARIES; PROVIDING THAT QUALIFYING MEDICAL MARIJUANA PATIENTS, THEIR CAREGIVERS AND NONPROFIT DISPENSARY OPERATORS SHALL NOT BE SUBJECT TO CRIMINAL OR CIVIL PENALTIES OR OTHER FORMS OF DISCRIMINATION FOR ENGAGING IN OR ASSISTING WITH THE PATIENTS' MEDICAL USE OF MARIJUANA; AUTHORIZING LIMITED CULTIVATION OF MARIJUANA BY PATIENTS OR CAREGIVERS IF A PATIENT LIVES MORE THAN FIVE MILES FROM THE NEAREST *Page 2 
NONPROFIT DISPENSARY; DIRECTING THE DEPARTMENT OF HEALTH TO ESTABLISH RULES RELATED TO THE PROCESSING OF APPLICATIONS FOR REGISTRY IDENTIFICATION CARDS AND TO THE OPERATIONS OF NONPROFIT DISPENSARIES; SETTING MAXIMUM REGISTRATION FEES FOR NONPROFIT DISPENSARIES; ESTABLISHING QUAIFICATIONS [SIC] FOR REGISTRY IDENTIFICATION CARDS; ESTABLISHING STANDARDS TO ENSURE THAT PATIENT AND CAREGIVER REGISTRATION INFORMATION IS TREATED AS CONFIDENTIAL; DIRECTING THE DEPARTMENT OF HEALTH TO PROVIDE THE LEGISLATURE ANNUAL QUANTITATIVE REPORTS ABOUT THE MEDICAL MARIJUANA PROGRAM; SETTING CERTAIN LIMITATIONS ON THE USE OF MEDICAL MARIJUANA BY PATIENTS; ESTABLISHING AN AFFIRMATIVE DEFENSE FOR THE MEDICAL USE OF MARIJUANA; ESTABLISHING REGISTRATION AND OPERATION REQUIREMENTS FOR NONPROFIT DISPENSARIES; SETTING LIMITS ON THE AMOUNT OF MARIJUANA A NONPROFIT DISPENSARY MAY CULTIVATE AND THE AMOUNT OF MARIJUANA A NONPROFIT DISPENSARY MAY DISPENSE TO A PATIENT; PROHIBITING CERTAIN CONDUCT BY PHYSICIANS; ALLOWING LOCALITIES TO LIMIT THE NUMBER OF NONPROFIT DISPENSARIES AND TO ENACT REASONABLE REGULATIONS GOVERNING THEIR OPERATIONS.
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition. Neither certificationnor rejection of a popular name and ballot title reflects my view ofthe merits of the proposal. This Office has been given no authorityto consider the merits of any measure. *Page 3 
In this regard, A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. In addition, following Arkansas Supreme Court precedent, this office will not address the constitutionality of proposed measures in the context of a ballot title review unless the measure is "clearly contrary to law."Kurrus v. Priest, 342 Ark. 434, 29 S.W.3d 669 (2000);Donovan v. Priest, 326 Ark. 353, 931 S.W.2d (1996); andPlugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensurethat the popular name and ballot title honestly, intelligibly, andfairly set forth the purpose of the proposed amendment or act. SeeArkansas Women's Political Caucus v. Riviere,282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device.Pafford v. Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v.Bryant, 259 Ark. 294, 532 S.W.2d 741 (1976); Moore v.Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
"It is axiomatic that the majority of voters will derive their information about a proposed measure from the ballot title immediately before exercising the right of suffrage."Kinchen v. Wilkins, 367 Ark. 71, 76, 238 S.W.3d 94 (2006). The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall,229 Ark. 416, 316 S.W.2d 185 (1958); Becker v. Riviere,270 Ark. 219, 604 S.W.2d 555 (1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen,318 Ark. 277, 285, 884 S.W.2d 938 (1994), *Page 4 
citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34 (1990);Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988);Hoban v. Hall, supra; and Walton v. McDonald,192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. § 7-5-522's five-minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen,310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring.Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law.Christian Civic Action Committee v. McCuen,318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial.Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citingLeigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed measure, popular name, and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. In my view, your ballot title is deficient and cannot provide a full and correct summary of your proposal without revision.[1] Likewise your popular name may be deficient in its focus on one fundamental aspect of the proposal to the exclusion of other very significant aspects. But the text's ambiguities prevent me from determining all of the proposal's material effects, so I am unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b).[2] *Page 5 
This office normally attempts to note and discuss all significant ambiguities of each proposal determined to contain textual ambiguities. Due to your proposal's length and complexity, however, I am unable to represent to you that this letter necessarily contains an exhaustive list of all the proposal's ambiguities. In considering whether to submit a revised proposal, you should be aware that we may call attention to a proposal's ambiguities on any review, even though they may have been embodied in an earlier version of the proposal.
I refer to the following ambiguities:
 1. Section 2(7) defines "nonprofit dispensary" in part as an entity "registered under section [8]. . . ." Section 2(12) defines "registered nonprofit dispensary" in part as an entity "registered . . . pursuant to section [8(2] ." Section 8 provides only one scheme for registering dispensaries. Accordingly there appears to be no difference between a nonprofit dispensary and a registered nonprofit dispensary. But the separate definitions, and each term's extensive use in the proposal, impart a strong implication that the terms denote different things. See, e.g., sections 2(8) ("registered nonprofit dispensary" used in definition of "nonprofit dispensary agent"), 2(10) ("nonprofit dispensary" used in definition of "designated caregiver"), 3(6) ("nonprofit dispensary" used in describing entity entitled to accept or transfer marijuana seedlings and related items), 4(3) ("nonprofit dispensaries" may be the subject of Department rules, which rules may not unduly burden "registered nonprofit dispensaries"). It is inherently ambiguous, in my view, to use different statutory terms, particularly defined terms, to denote the same thing. So too is the use of similar phrases to denote different things where the difference is not clearly explained.
 2. Section 2(7)'s definition of "nonprofit dispensary" is also ambiguous in suggesting, by use of the word "or," that a dispensary may do only one of the activities listed. The definition has also syntax problems that become evident when examining whether it includes or excludes particular single activities. For example: "`Nonprofit dispensary' *Page 6 
means a[n] . . . entity . . . that acquires . . . marijuana . . . to a registered qualifying patient. . . ." Id. (emphasis added). The definition is clearly meaningless in part and necessarily ambiguous.
 3. Section 2(10) defines "designated caregiver" as a person who, among other things, "has agreed to assist with a qualifying patient's medical use of marijuana. . . ." Section 2(13) defines "registered designated caregiver" as a designated caregiver "who is registered with the department. . . ." The registration aspect of the latter definition means that these two defined terms, unlike the ones discussed in the previous paragraph, actually do have different meanings. The term "designated caregiver" is used repeatedly in the proposal. See, e.g., section 3(1)(b) (implying that an (unregistered) designated caregiver may grow marijuana). It is not clear that the act is truly intended to regulate or permit the conduct of (unregistered) designated caregivers in each instance in which that term is used.
 4. Section 2(11) defines "qualifying patient" as "a person who has been diagnosed by a physician as having a debilitating medical condition. Section 2(14) defines "registered qualifying patient" as a qualifying patient who is registered with the department. Once again, the definitions make clear that these two defined terms denote different things. And once again the broader term (qualifying patient) is used repeatedly in the proposal, resulting in confusion about the proposal's intent. For example, section 3(2)(b) states that a designated caregiver may grow marijuana for "each qualifying patient who has specified" the designated caregiver as his or her grower. That provision might be interpreted to refer to a specification in the application and registration process only, but its language is not expressly so limited. Similarly, section 9(2)(k) prohibits a dispensary from providing more than 2.5 ounces of marijuana to a "qualifying patient" in a 15-day period, possibly implying that a dispensary could provide 2.5 ounces or less to an (unregistered) qualifying patient.
 5. Section 3(7) protects "registered qualifying patients" from various forms of discrimination. Section 5(5) provides that registry cards *Page 7 
generally expire one year after issuance. As I understand the proposal, upon expiration of her registry card, a registered qualified patient becomes a qualified patient and therefore presumably immediately ineligible to receive the protections of section 3(7). It is my understanding that evidence of marijuana use is detectible for a number of days or weeks following a person's last use of marijuana. If that understanding is correct, your proposal is ambiguous and unclear in apparently depriving of the protections of section 3(7) a person who used marijuana lawfully (at least insofar as the act is concerned) before her registration expired, and thereafter showed evidence of prior marijuana use (as was completely foreseeable). The act's apparent allowance of discrimination against (unregistered) qualifying patients does not, in my view, square with the act's general approach, raising the possibility that the consequence is unintended and creating ambiguity.
 6. The same section prohibits certain discrimination against a "designated caregiver." The obvious implication of the language used, in light of the act's defined terms, is that an unregistered designated caregiver, unlike an unregistered qualifying patient, is protected under section 3(7). Why, if at all, the proposal would protect all designated caregivers, but only those qualifying patients who have registered, is not clear and may not have been intended.
 7. The proposal repeatedly uses defined terms accompanied by modifiers that, in total, may or may not mean the same things denoted by other defined terms. For example, section 3(1) refers to a "qualifying patient who has been issued and possesses a registry identification card." Similarly, section 3(2) refers to a "designated caregiver who has been issued and possesses a registry identification card." One is left to wonder whether the quoted phrases mean the same things as the defined terms "registered qualifying patient" and "registered designated caregiver." If so, what reason is there to use the longer phrases? Or, if the formulation is intended to add a requirement that the qualifying patient or designated caregiver be in actual physical possession of a registry card in order to be protected under the act, why would the act not simply refer to a registered qualifying patient or registered designated caregiver "in actual possession *Page 8 
of a registry identification card" or the like? Section 3(4) contains very similar ambiguities. And section 3(1)(b) uses both the undefined phrase "operating nonprofit dispensary" and the defined term "nonprofit dispensary," but not the defined term "registered nonprofit dispensary." It is unclear whether these three phrases are intended to refer to one, two, or three different things.
 8. Section 2(1) defines "cardholder" as a person who, among other things, "possesses a valid registration identification card." (Emphasis added.) This provision makes ambiguous other parts of the act, including without limitation sections 3(1) and 3(2), that require possession of "a registry identification card," by placing into doubt whether the card must be currently valid.
 9. The act essentially provides that a person diagnosed by a physician to have a debilitating medical condition may register under the act and thereby become a registered qualifying patient, entitled to the act's protections. Registration involves, among other things, the provision of a physician's written certification to the effect that the person "has a debilitating medical condition and the potential benefits of the medical use of marijuana would likely outweigh the health risks. . . ." Section 2(18). Section 3(10) provides that a physician is protected from prosecution and other consequences in "providing written certifications" and in "otherwise stating that . . . a patient is likely to receive therapeutic benefit from the medical use of marijuana. . . ." Obviously, the act protects a physician who provides written certifications because written certifications are an integral part of the act. Absent written certifications, there is no mechanism by which the act permits anyone to use marijuana medically. By contrast, it is not at all clear why the act protects a physician who "otherwise stat[es] that . . . a patient is likely to receive therapeutic benefit from the medical use of marijuana. . . ." As far as I can tell, such a statement is not otherwise required or contemplated by the act, a physician's provision of such a statement does not appear to be relevant to the act's regulatory scheme, and such a statement probably would have no effect with respect to any matter governed by the act. If that is the case, *Page 9 
the act's description of the statement is ambiguous in suggesting meaning where none is present.
 10. In a related matter, section 7 provides an affirmative defense to prosecution of a marijuana offense if, among other things, a "practitioner" states that the defendant "is likely to receive therapeutic or palliative benefit from marijuana. . . ." As described above, a person may become a "registered qualifying patient" by, among other things, producing a physician's written certification that takes into account the potential risks of marijuana use as well as the potential benefits, and a person may take advantage of the act's affirmative defense with a practitioner's statement regarding therapeutic benefit. It is unclear why, or even whether, the act is intended to impose a stricter standard on persons wishing to become registered qualifying patients (a standard requiring consideration of both potential benefits and potential risks and their balancing) than on persons wishing to raise the affirmative defense (a standard that considers only potential benefits). Neither is it clear why, or again whether, the proposal is intended to distinguish between practitioners and physicians, and why it defines only the latter. Adding to the ambiguity is section 7's use of yet a third standard ("therapeutic or palliative benefit") supporting a person's medical use of marijuana.
 11. Section 3(11) protects any person from prosecution for "providing a registered qualifying patient or a registered designated caregiver with marijuana paraphernalia for purposes of a qualifying patient's medical use of marijuana." It is unclear and ambiguous why a person is apparently protected in supplying paraphernalia to a registered qualifying patient for use by an (unregistered) qualifying patient.
 12. Section 4(1) authorizes the Department to "adopt rules to carry out [the act's] purposes," and provides that they "are routine technical rules as defined in Ark. Code Ann. [sec] 25-15-201 et seq., the Arkansas Administrative Procedure Act." Because the APA does not, in fact, define the term "routine technical rules," it is impossible to determine whether your proposal is intended somehow to affect how the APA would apply to Department rules adopted pursuant to the proposal's rulemaking authority. *Page 10 
 Your use of the term "routine technical rules" implies, in my view, that the Department, under your proposal, is intended to be under less stringent APA standards than would apply to its adoption of what are defined by the APA simply as "rules." See
A.C.A. § 25-15-202(8) (Supp. 2009). Because the APA does not, however, recognize "routine technical rules," the language merely creates confusion and ambiguity.
 13. Section 5(1)(g) requires a qualifying patient's application for registration to designate "who will be allowed under state law to cultivate marijuana plants for the qualifying patient's medical use." The proposal seems fairly clear elsewhere that only a designated caregiver or a nonprofit dispensary may grow marijuana for a qualifying patient, but this provision implies that any "individual" may be designated and thereby creates ambiguity.
 14. Section 9(2)(c) and other provisions of the proposal imply that all nonprofit dispensary agents "work at" the nonprofit dispensary. To the contrary, "nonprofit dispensary agent" is defined as "a principal officer, board member, employee, manager, volunteer, or agent of a registered dispensary. . . ." Section 2(8). The word "work" generally suggests employment. The definition of "nonprofit dispensary agent" includes persons clearly not necessarily employed by the dispensary. The result is ambiguity about the operation of section 9(2)(c) and other sections whose operation depends on whether an agent then "works at" a dispensary. A similar ambiguity is present with respect to "volunteer" dispensary agents, referred to in section 10(2)(a) and (b).
 15. As noted above, a nonprofit dispensary agent may be, among other things, an officer, board member, or manager. Section 8(2)(a)(ii)(C) requires dispensaries to state in applications "the name, address and date of birth of each principal officer and board member. . . ." The words "officer" and "board member" imply a corporation. The word "manager" may imply a limited liability company. Notwithstanding the implication to the otherwise contained in the agent definition, then, it appears that only a corporation could satisfy section 8(2)(a)(ii)(C) and register as a nonprofit *Page 11 
dispensary. I question whether this result is intended and deem it ambiguous.
I take this opportunity to note several matters that, while not necessarily legally objectionable, do not facilitate review and understanding of your proposal. Your proposal designates each section by two different numbers, a one-digit number like "8" and a three-digit number like "108." It uses a section and subsection designation scheme in the form "108(2)(a)(ii)(B)" while the Arkansas Code Annotated uses a form that would designate the same subsection "-108(b)(i)(B)(2)." And the definitions in sections 2(10) and 2(13) are not in alphabetical order as are the other definitions.
Finally, I must note the particular hazards attendant to the preparation of a ballot title for a lengthy and complex proposal such as yours. Your proposal contains almost 8,500 words. Your current ballot title contains 223 words in 15 clauses. Except for the first two clauses of the ballot title, which appear to be an attempt to describe the entire proposal in extremely broad and general terms, the ballot title appears to describe only about half of the proposal's text.
Material parts of the proposal are simply not described. I note in particular three omissions. First, the ballot title states that the act will make marijuana's medical use "legal." Your use of that word
 fails to acknowledge that your proposed measure cannot completely legalize marijuana in Arkansas for medical purposes because the drug remains illegal under federal law, 21 U.S.C. § 801 et seq.
(the Controlled Substances Act). Gonzales v. Raich, 545 U.S. 1 (2005); United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483 (2001). The upshot of Raich is that the federal government and its agencies have the authority to enforce the federal drug laws, even in a state that has sanctioned the use of marijuana for medicinal purposes. See Note, California Takes a Hit: The Supreme Court Upholds Congressional Authority over the State-Approved Use of Medicinal Marijuana. Gonzales v. Raich, 545 U.S. 1 (2005), 28 UALR L. Rev. 545, 580 (2006) ("The Raich decision makes it clear that federal authorities can prosecute patients possessing and *Page 12 
consuming marijuana for medicinal purposes, irrespective of a state statute authorizing the patients use.")
Op. Att'y Gen. 2009-208
Your ballot title is accordingly misleading in failing to acknowledge and inform voters that marijuana will remain generally prohibited under the Controlled Substances Act even if your proposal is adopted.
Second, the proposal apparently would allow registered qualifying patients and registered designated caregivers to acquire marijuana for medical use from any source, whether sanctioned under the act or illegal. Section 3(1) protects certain registered qualified patients from criminal prosecution and other consequences for "the medical use of marijuana in accordance with [the act]." "Medical use" includes the "acquisition" of marijuana, but it does not condition a person's medical use on the source of the marijuana used medically. Likewise section 3(2) protects designated caregivers who "assist" certain registered qualified patients in the "medical use of marijuana. . . ." Like the provision on qualified patients, this section appears to allow designated caregivers lawfully to acquire marijuana from any source. It appears, then, that your proposal may reasonably be expected to create or release pent-up demand for marijuana sold illegally as well as marijuana cultivated or dispensed under the act. Voters should be made aware of such a foreseeable result of the proposal's adoption.
Third, the affirmative defense from criminal prosecution provided by the act is completely divorced from the act's regulatory medical marijuana scheme. A complete stranger to the regulatory system may assert the affirmative defense; no registration is required. And the marijuana quantity limitations that apply to registered qualified patients and registered designated caregivers do not apply to persons asserting the affirmative defense. Any ballot title omitting a description of these significant elements of the proposal's affirmative defense is deficient.
Other omissions include, without limitation, the proposal's defined terms, in which a great deal of the proposal's substance resides; the manner in which dispensaries acquire marijuana and related materials from others; the provision allowing designated caregivers to receive compensation; the power of the *Page 13 
Department to grant petitions to designate additional debilitating conditions and the absence of any standard governing or guiding the Department in considering such a petition; the immunities given dispensaries; the prohibitions on dispensaries; and the provisions excusing applicants from obtaining otherwise-required Department approvals (or deeming them to have been given) in certain circumstances.
The ballot title for any measure of such length and complexity as yours must avoid both of two dangers: that of being too lengthy and that of omitting important matter. More specifically, the title cannot be so long that it causes voters to violate the voting booth time limitations, yet it must not omit any of the proposed measure's important factors. For this reason, I must point out that with any proposed amendment of considerable length and complexity such as yours, the sponsor runs the risk of a challenge and of a finding by the court that the ballot title is unacceptable, either because it is too "complex, detailed, and lengthy," or because it has "serious omissions." See, e.g., Page v.McCuen, 318 Ark. 342, 884 S.W.2d 951 (1994); Walker v.Priest, 342 Ark. 410, 29 S.W.3d 657 (2000) and Op. Att'y Gen. 2007-160, 2005-212.
My office, in the certification of ballot titles and popular names, does not concern itself with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107 and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law.See, e.g., Finn v. McCuen, 303 Ark. 418, 793 S.W.2d 34 (1990). Furthermore, the Court has recently confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v.Priest, 341 Ark. 813, 20 S.W.3d 376 (2000). The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to *Page 14 
confusion in the ballot title itself." Id. Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title.See A.C.A. § 7-9-107(c). You may, after clarification of the matters discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] See infra pp. 11-13 for a discussion of some of the current ballot title's deficiencies.
[2] You should note, however, that even absent the text's ambiguities, I likely would decline to prepare a substitute popular name and ballot title in this case. The ballot title you submitted fails, in my opinion, to meet the guidelines discussed above, particularly in completely omitting to describe several essential facts relating to the proposal that would give voters serious ground for reflection. It does not sufficiently convey the whole substance of your proposed act to the electorate and, in my view, cannot do so absent fundamental revision. This office may reject rather than substitute for a ballot title that is wholly deficient in this regard. See, e.g., Op. Att'y Gen. 2008-056, 2007-316.