Mr. Harold G. Martin 209 Trivista Left Hot Springs, AR 71901
Dear Mr. Martin:
This is in response to your request for certification, pursuant to A.C.A. § 7-9-107 (Repl. 2000), of the following popular name and ballot title for a proposed constitutional amendment. Similar measures have been previously submitted on your behalf, some of which this office rejected due to ambiguities in the text of the proposed amendments. See Ops. Att'y Gen. 2004-112, 2004-086, 2004-061, 2004-038, 2004-004, 2003-026, 2003-008, 2002-346, 2002-335, 2002-325, 2002-308, 2002-293, 2002-272, 2002-227 and 2002-208. On March 6, 2003, this office revised and certified the popular name and ballot title for a similar measure, as evidenced by Op. Att'y Gen. 2003-054. You have since made changes to your measure and have submitted a revised popular name and ballot title for my certification. Your proposed popular name and ballot title state:
 Popular Name AN AMENDMENT AUTHORIZING BINGO AND RAFFLES BY NON-PROFIT ORGANIZATIONS INCORPORATED IN THE STATE, AUTHORIZING THE GENERAL ASSEMBLY TO OPERATE LOTTERIES AND AUTHORIZING HAROLD GLEN MARTIN TO OPERATE GAMBLING
 Ballot Title AN AMENDMENT TO THE ARKANSAS CONSTITUTION AUTHORIZING BINGO AND RAFFLES BY NON-PROFIT ORGANIZATIONS INCORPORATED IN THE STATE; AUTHORIZING THE GENERAL ASSEMBLY WITH THE DISCRETION TO CREATE, TAX, LICENSE AND REGULATE A LOTTERY OR LOTTERIES WITH THE STATE-WIDE SALE OF LOTTERY TICKETS TO BE OPERATED BY THE STATE, OR AN AGENCY OF THE STATE THEREOF, TO INCLUDE THE STATE'S OPERATION OF SUCH LOTTERIES IN COOPERATION WITH THE LOTTERIES OPERATED BY OTHER STATES AND OR LOTTERIES IN COMBINATION WITH THE LOTTERIES OPERATED BY OTHER STATES WHICH SIGNIFICANTLY CHANGES CURRENT LAWS UNDER ARKANSAS CONSTITUTION ARTICLE 19 SECTION 14 EFFECTING GAMBLING; AUTHORIZING HAROLD GLEN MARTIN TO OPERATE GAMBLING, EMPLOY PERSONS TO OPERATE GAMBLING AND SUBCONTRACT ANY INDEPENDENT CONTRACTOR(S) TO OPERATE GAMBLING ON ANY DAY FOR THE WHOLE OF A 24 DAY WITHIN ONE STRUCTURE WITHIN EACH OF THE FOLLOWING COUNTIES OF CARROLL, CHICOT, CRAWFORD, CRITTENDEN, BENTON, GARLAND, JEFFERSON, MILLER, MISSISSIPPI, PULASKI AND SEBASTIAN WITH SUCH STRUCTURE LOCATED WITHIN THOSE COUNTIES OR WITHIN ANY CITY OR TOWN WITHIN THOSE COUNTIES; PROVIDING EACH GAMBLING OPERATION WITHIN EACH COUNTY IS CONSIDERED AN INDIVIDUAL AND SEPARATE GAMBLING OPERATION; AUTHORIZING HAROLD GLEN MARTIN, THOSE EMPLOYED AND SUBCONTRACTED TO OPERATE GAMBLING TO SELL AND SERVE ALCOHOLIC BEVERAGES ON ANY DAY FOR THE WHOLE OF A 24 DAY ONLY WITHIN THE INTERIOR AREA OF THOSE STRUCTURES USED FOR GAMBLING (INCLUDING THOSE COUNTIES, CITIES AND TOWNS IN WHICH THE SALE OF ALCOHOLIC BEVERAGES IS OTHERWISE PROHIBITED); PROHIBITING THE GENERAL ASSEMBLY, AND OR ANY AGENCY OF THE STATE THEREOF, UNLESS PROVIDED FOR DIFFERENTLY WITHIN THIS AMENDMENT FROM REGULATING BINGO, RAFFLES AND GAMBLING IN ANY MANNER; PROHIBITING THE GENERAL ASSEMBLY, AND OR ANY AGENCY OF THE STATE THEREOF, UNLESS PROVIDED FOR DIFFERENTLY WITHIN THIS AMENDMENT FROM REQUIRING ANY LICENSE, FEE OR PERMIT TO OPERATE BINGO AND RAFFLES, GAMBLING AND THE SALE OF ALCOHOLIC BEVERAGES RELATED TO GAMBLING; PROHIBITING THE STATE, OR ANY AGENCY OF THE STATE THEREOF, UNLESS PROVIDED FOR DIFFERENTLY WITHIN THIS AMENDMENT FROM TAXING THE REVENUES DERIVED FROM THE OPERATION OF BINGO, RAFFLES, GAMBLING AND SALE OF ALCOHOLIC BEVERAGES SOLD IN RELATION TO GAMBLING; REQUIRING THE GAMBLING OPERATOR ANNUALLY PAY 8% OF THE PROFIT EARNED FROM EACH GAMBLING OPERATION WITHIN THE STATE TO THE STATE'S GENERAL FUND, 8% OF THE PROFIT EARNED ANNUALLY TO THE COUNTY'S GENERAL FUND IN WHICH GAMBLING IS OPERATED AND 8% OF THE PROFIT EARNED ANNUALLY TO THE CITY'S GENERAL FUND IN WHICH GAMBLING IS OPERATED; AUTHORIZING THE STATE, OR AN AGENCY OF THE STATE THEREOF, TO AUDIT ALL THE BOOKS AND ACCOUNTS OF EACH GAMBLING OPERATION TO CALCULATE THE AMOUNT OF TAX WHICH SHALL BE PAID BY THE GAMBLING OPERATOR; EXEMPTING THE TRANSFER OF EACH GAMBLING OPERATION WITH OR WITHOUT SALE FROM APPROVAL BY THE STATE, OR ANY AGENCY OF THE STATE THEREOF; PROVIDING FOR THE LEGAL SHIPMENT OF GAMBLING DEVICES INTO THE STATE; DEFINING" BINGO" AS THE RISKING OF MONEY ON A GAME PLAYED WITH NUMBERED CARDS CORRESPONDING TO NUMBERED BALLS DRAWN AT RANDOM TO WIN MONEY OR A PRIZE; DEFINING "RAFFLES" AS THE RISKING OF MONEY FOR THE DISTRIBUTION OF A PRIZE AMONG PERSONS WHO HAVE PAID FOR A CHANCE TO OBTAIN A PRIZE BUT EXCLUDES MONEY AS A PRIZE; DEFINING "LOTTERY" AS THE TYPICAL FORM OF A LOTTERY CHARACTERIZED BY THE ARKANSAS SUPREME COURT WHICH INVOLVES THE SALE OF A LARGE NUMBER OF CHANCES RELATIVE TO THE SELECTION OF A SMALL NUMBER OF WINNERS BY A DRAWING DETERMINED BY CHANCE ALONE; DEFINING "GAMBLING" AS THE RISKING OF MONEY BETWEEN TWO OR MORE PERSONS WITH A CONTEST OR GAME OF CHANCE, SKILL OR ANY COMBINATION THEREOF WITH ONE AS WINNER THE OTHER(S) AS LOSER BUT EXCLUDES THE OPERATION OF BINGO, RAFFLES AND LOTTERIES; DEFINING "STRUCTURE" AS ANY KIND AND SIZE OF BUILDING OR ANCHORED WATER VESSEL WITH ANY SIZE AND KIND OF ATTACHED ADDITION CONSIDERED ONE STRUCTURE; DEFINING "GAMBLING OPERATOR" AS HAROLD GLEN MARTIN OR THOSE PERSONS, COMPANIES OR CORPORATIONS TO WHICH THE GAMBLING OPERATION IS TRANSFERRED; DEFINING "GAMBLING OPERATION" AS THE AUTHORITY OF THE GAMBLING OPERATOR TO OPERATE GAMBLING, EMPLOY AND SUBCONTRACT ANY INDEPENDENT CONTRACTOR(S) TO OPERATE GAMBLING WITH THE SALE AND SERVICE OF ALCOHOLIC BEVERAGES; DEFINING "PROFIT" AS THE AMOUNT OF MONEY PAID TO THE GAMBLING OPERATOR AFTER DEDUCTING THE COSTS OF EMPLOYEE PAYROLL, EMPLOYEE BENEFITS, INSURANCE, UTILITIES, INTEREST ON LOANS, SUBCONTRACTING THE GAMBLING OPERATION AND CONTRIBUTIONS TO ANY NON-PROFIT ORGANIZATIONS FROM THE GROSS EARNINGS WHICH IS THE TOTAL AMOUNT OF MONEY EARNED FROM GAMBLING AFTER THE DEDUCTION OF MONEY PAID AS A LOSS TO THOSE AS WINNERS; THE PROVISIONS OF THIS AMENDMENT SHALL BE SELF EXECUTING AND SHALL TAKE EFFECT IMMEDIATELY UPON PASSAGE OF THIS AMENDMENT; MAKING THE PROVISIONS OF THIS AMENDMENT SEVERABLE AND REPEALING ALL LAWS AND CONSTITUTIONAL AMENDMENTS IN CONFLICT WITH THIS AMENDMENT
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition.
A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensure that the popular name and ballot title honestly, intelligibly, and fairly set forth the purpose of the proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device. Pafford v.Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v. Bryant, 259 Ark. 294, 532 S.W.2d 741
(1976); Moore v. Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall, 229 Ark. 416, 417, 316 S.W.2d 185
(1958); Becker v. Riviere, 270 Ark. 219, 223, 226, 604 S.W.2d 555
(1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen, 318 Ark. 277, 285,884 S.W.2d 938 (1994), citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34
(1990); Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald, 192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. §7-5-522's five minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring. Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law. Christian CivicAction Committee v. McCuen, 318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial. Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citing Leigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed amendment, as well as your proposed popular name and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your popular name and ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot, however, at this time, fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b).
I refer to the following ambiguities:
 1. You have, in your current submission, inexplicably reinserted language I previously rejected in Op. Att'y Gen. 2004-004. Section 1(2) of your current submission provides as follows: "Authorizing the General Assembly with the discretion to create, tax, license and regulate a lottery or lotteries to be operated by the State, or an agency of the State thereof, with the statewide sale of lottery tickets to include the State's operation of such lotteries in cooperation with the lotteries of other states and or lotteries operated in combination by other states." (Emphasis added.) You have reinserted the emphasized language. In Opinion 2004-004, issued to you, I stated that: "An additional ambiguity arises from the language `to include the operation of a lottery or lotteries in cooperation with the lotteries operated by other states and in cooperation with the lotteries operated in combination by other states. . . .' In addition to being confusingly wordy, the use of the words `to include' create an ambiguity as to whether the General Assembly must, if it creates a lottery, include the operation of a lottery in cooperation with other states or the combined lotteries of other states. The use of such arguably mandatory language potentially conflicts with the earlier part of the sentence `empowering' the General Assembly to operate a lottery."
 2. You have added a new section to your proposal at Section 1(7), which provides that: "Unless provided for differently within the provisions of this amendment the General Assembly, and or any agency of the State thereof, shall be prohibited from regulating in any manner the operation of bingo and raffles, as provided in (1) of this Section, and the operation of gambling, as provided in (3) of this Section." Several ambiguities arise from this language. First, as I previously stated to you in Op. Att'y Gen. 2004-086, language such as this leaves unclear the authority of political subdivisions to regulate the listed activities. You do not mention any such authority in your amendment, and although cities and counties are currently prohibited by statute from exercising any such authority, Section 3 of your proposed amendment states that the "General Assembly shall be required to make all other laws to the enforcement of this Constitutional Amendment." It is unclear whether this language would authorize the General Assembly to invest political subdivisions with any regulatory authority. Second, the language of Section 1(7) prohibiting regulation by the General Assembly unless provided for differently in the amendment creates an ambiguity in light of Section 1(13) of your amendment, which provides that: "The State, and or an agency of the State thereof, shall be authorized to annually audit all the books and accounts of each gambling operation to calculate and determine the amount of tax which the gambling operator of each gambling operation is required to pay, as provided in (9)(10) and (11) of this Section." As I previously stated to you in Op. Att'y Gen. 2004-086 with regard to a similar provision:" An ambiguity arises from this provision in light of the fact that you have prohibited the General Assembly in Section 1(12) of your amendment from regulating gambling. What state agency will conduct such an audit and who is to determine this fact if the General Assembly is prohibited from regulating gambling?" A similar ambiguity exists in you current submission. Although you purport to require the General Assembly in Section 3 of your amendment to "make all other laws to the enforcement of this Constitutional Amendment" I have previously stated with regard to such language, in analyzing a submission in which you participated, that "While I am somewhat uncertain what this language means, I do not construe it to establish regulatory authority over the various activities." See Op. Att'y Gen. 2003-008.
 3. This language of Section 3 requiring the General Assembly to "make all other laws . . ." itself gives rise to several ambiguities. It is confusing, as I previously stated to you in Op. Att'y Gen. 2004-061, to both declare an amendment "self-executing," as you do in Section 3 of your proposal and to require the General Assembly to make laws "to the enforcement" of the amendment. See also Op. Att'y Gen. 2002-293. Additionally, as I have previously indicated, this language requiring the General Assembly to "make all other laws to the enforcement" of the amendment is vague and unclear as to the extent of the General Assembly's power, particularly where you have expressly barred that body from regulating certain activities elsewhere in your amendment. See Op. Att'y Gen. 2003-008.
 4. You have changed two provisions of your submission regarding the calculation of "profit" for purposes of determining the taxes payable from the operation of gambling. Section 1(12) provides that the "gambling operator shall be authorized to deduct only the cost of employee payroll, employee benefits, insurance, utilities, interest on loans, subcontracting of the gambling operation and contributions to any non-profit organization from the gross earnings which is the total amount of money earned from gambling after the deduction of money paid as a loss to those as winners to calculate and determine the amount of profit." See also Section 2(1)(h), defining "profit." As I previously stated to you in Op. Att'y Gen. 2004-004, "A further ambiguity arises from the exclusion of `donations to any non-profit organization' from the definition of `profit.' This language on its face would allow the gambling operator to effectively donate any sums realized from the gambling operations to nonprofit organizations and thereby avoid the payment of any taxes to the state, county or affected city or town under Section 3(4), (5), and (6) of your amendment. A similar argument might be made with relation to `employer payroll and benefits.' If this is indeed authorized by your amendment it must be made clear to the voters."
As can be seen from the discussion of the ambiguities above, I have already addressed many of the problems in your current submission in my responses to your previous submissions. I strongly urge you to review all of your previous submissions and my responses thereto prior to redrafting and resubmitting any more proposed amendments for my review. It is a waste of my staff's time and thus the taxpayers' money to continually rehash the same points in addressing your submissions. As I stated in Opinion 2004-062, in responding to a sponsor with whom you have previously cooperated: "[a]ccordingly, although I will continue to discharge my duty to review proposed amendments submitted to this office, please be advised that I will summarily decline in the future to repeat analyses that I have offered on previous submissions and that you have chosen to ignore."
My office, in the certification of ballot titles and popular names, does not concern itself with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107
and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law. See, e.g., Finnv. McCuen, 303 Ark. 418, 793 S.W.2d 34 (1990). Furthermore, the Court has confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v. Priest,341 Ark. 813, 20 S.W.3d 376 (2000). The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id.
Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title. See A.C.A. §7-9-107(c). You may, after clarification of the matter discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I anticipate, as noted above, that some changes or additions to your submitted ballot title may be necessary. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
MIKE BEEBE Attorney General
MB:cyh