Chris H. Stewart, Esq. Stewart Law Firm 1020 West 4th Street, Suite 400 Little Rock, Arkansas 72201
Dear Mr. Stewart:
This is in response to your request for certification, pursuant to A.C.A. § 7-9-107 (Repl. 2007), of the popular name and ballot title for a proposed initiated measure.[1] You previously submitted a similar measure, which this office rejected due to ambiguities in the text of the proposal. See Op. Att'y Gen. 2010-013. You have made changes in the text of your proposal since your last submission and have now submitted the following proposed popular name and ballot title for my certification:
 Popular Name FREEDOM OF CHOICE FOR HEALTH CARE AMENDMENT Ballot Title AN AMENDMENT PROVIDING THAT NO LAW OR RULE SHALL DIRECTLY OR INDIRECTLY COMPEL A PERSON, EMPLOYER OR HEALTH CARE PROVIDER TO PARTICIPATE *Page 2 
IN A HEALTH CARE SYSTEM. A PERSON OR EMPLOYER MAY PAY DIRECTLY FOR LAWFUL HEALTH CARE SERVICES. A HEALTH CARE PROVIDER MAY ACCEPT DIRECT PAYMENT FOR LAWFUL HEALTH CARE SERVICES. THIS AMENDMENT DOES NOT AFFECT THE FOLLOWING: WHICH HEALTH CARE SERVICES A HEALTH CARE PROVIDER IS REQUIRED TO PERFORM OR PROVIDE; WHICH HEALTH CARE SERVICES ARE PERMITTED BY LAW; OR THE TERMS OR CONDITIONS FOR ACCEPTING DIRECT PAYMENT FROM A PERSON OR EMPLOYER FOR LAWFUL HEALTH CARE SERVICES. THIS AMENDMENT DOES NOT PROHIBIT CARE PROVIDED PURSUANT TO ARK. CONST., ART. 5, § 32, THE WORKERS' COMPENSATION LAW, ARKANSAS CODE § 11-9-101 ET SEQ, THE ARKIDS FIRST PROGRAM ACT, ARKANSAS CODE § 20-77-1101 ET SEQ, OR THE PATIENT PROTECTION ACT, ARKANSAS CODE § 23-99-201 ET SEQ.
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition. Neither certificationnor rejection of a popular name and ballot title reflects my view ofthe merits of the proposal. This Office has been given no authorityto consider the merits of any measure.
In this regard, A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. In addition, following Arkansas Supreme Court precedent, this office will not address the constitutionality of proposed measures in the context of a ballot title review unless the measure is "clearly contrary to law."Kurrus v. Priest, 342 Ark. 434, 29 S.W.3d, 669 (2000);Donovan v. Priest, 326 Ark. 353, 931 S.W.2d 119 (1996); andPlugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). Consequently, this *Page 3 
review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certificationunder A.C.A. § 7-9-107 is to ensure that the popular name and ballottitle honestly, intelligibly, and fairly set forth the purpose ofthe proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 283 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device.Pafford v. Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v.Bryant, 259 Ark. 294, 532 S.W.2d 741 (1976); Moore v.Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
"It is axiomatic that the majority of voters will derive their information about a proposed measure from the ballot title immediately before exercising the right of suffrage."Kinchen v. Wilkins, 367 Ark. 71, 238 S.W.3d 94 (2006). The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall,229 Ark. 416, 417, 316 S.W.2d 185 (1958); Becker v. Riviere,270 Ark. 219, 223, 226, 604 S.W.2d 555 (1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen,318 Ark. 277, 285, 884 S.W.2d 938 (1994), citing Finn v.McCuen, 303 Ark. 418, 798 S.W.2d 34 (1990); Gaines v.McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald,192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. § 7-5-522's five minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen,310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, *Page 4 
must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring.Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law.Christian Civic Action Committee v. McCuen,318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial.Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citingLeigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
 The voter should not have to be well versed in legal interpretation in order to decipher what is meant in a proposed constitutional amendment. Placing the voter in a position of either having to be an expert in the subject of [the proposal] or having to guess as to the effect his or her vote would have is impermissible. See Dust v. Riviere, 277 Ark. 1, 638 S.W.2d 663 (1982). This is precisely the dire straits in which the voter is placed by the uncertain language contained in this measure.
Kurrus v. Priest, 342 Ark. 434, 444, 29 S.W.3d 669 (2000).
Particularly where the proposal is self-executing, as is your measure, and the General Assembly will have no opportunity to define words used in the proposal and otherwise clarify the rights and obligations affected by enactment of the proposal, it is necessary and appropriate to consider whether the voter will understand and appreciate the question presented. Cf. Cox v. Daniels,374 Ark. at 448, citing May v. Daniels,359 Ark. 100, 194 S.W.3d 771 (2004) (declining to interpret language of non-self-executing proposals).
Having analyzed your proposed measure, popular name, and ballot title under the above precepts, it is my conclusion that I must reject your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your popular name and ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot, however, at this time, fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b). *Page 5 
In addition, certain aspects of the proposed popular name and ballot title are ambiguous or misleading in and of themselves, apart from the language of the proposal, and therefore must be revised before they may appear on the ballot.
You should note that any revision of your proposal may create new ambiguities, as did this revision of your original proposal. Although this office, unless stated otherwise, generally attempts to note and discuss all a proposal's shortcomings upon each review, you should be aware that we may note a proposal's ambiguities and misleading aspects at any time, even though such shortcomings may have been embodied in an earlier version of the proposal. In this regard, please be advised that your latest revision of the proposed measure, discussed herein, created myriad ambiguities that were not present in the original proposal, at least in part by deleting a provision that negated the proposal's potential application to laws and rules adopted before a specified date. Because the proposed measure, as revised and currently drafted, has such broad potential application, as discussed herein, this letter is not represented to contain an exhaustive list of all ambiguities and misleading aspects of the proposal.
Ambiguities in the Text of the Proposal
Undefined Words and Terms
"Compel"
The fundamental operative provision of your proposal is section 2(a), which provides that "[a] law or rule shall not compel . . . a person . . . to participate in a health care system." Your original proposal defined the word "compel" in such a manner as to equate compulsion with the imposition of any penalty, fine, tax, surcharge, withholding, or fee, in any amount whatever, no matter how small, and no matter the consequence, if any, of failure to pay any such amount.
Apparently in response to Op. Att'y Gen. 2010-013, you revised your proposal to delete the definition; your proposal now does not define the word "compel."
In my opinion, the use of the undefined word "compel" renders the ballot title and the proposed measure impermissibly vague. InMay v. Daniels, supra, the court *Page 6 
upheld a ballot title containing the term "marital status" even though the term was used in a sense other than its normal one. The court concluded "that the term `marital status' is not vague because it can be understood by the voters within the context of the ballot title. The fact that a term is capable of more than one possible meaning does not render the term meaningless, so long as its meaning may be fairly gleaned from the context in which it is used."359 Ark. at 108.
Here, your original submission made clear that your intent is that the slightest incentive be equated with compulsion. But a voter is unlikely to understand your intent from the context of the language used in the ballot title. A voter is likely, in my opinion, to interpret the word as it is commonly used.
Various sources define and characterize "compel" as follows:
"Constrain, force . . . bring about . . . by force. . . ." TheConcise Oxford Dictionary of Current English
206 (6th ed. 1976).
"Constrain, force, oblige . . . [b]ring about or evoke by force."The New Shorter Oxford English Dictionary 458 (1993).
"[A] stronger word [than impel], connoting force or coercion, with little or no volition on the part of the one compelled." ADictionary of Modern American Usage 140 (1998).
"To cause or bring about by force, threats, or overwhelming pressure. . . ." Black's Law Dictionary
321 (9th ed. 2009).
In my opinion, the foregoing demonstrates that the word "compel" is commonly understood to involve more persuasive means than are necessarily intended by your proposal. It follows that the ballot title and proposed measure are impermissibly vague in employing the word without a definition. The measure's fundamental purpose is incapable of description in the ballot title as a consequence of this vague terminology. A ballot title must fairly allege the general purposes of the proposed amendment or act in order to meet the test of sufficiency established by the court. Ward v.Priest, 350 Ark. 345, 86 S.W.3d 884 (2002); Porter v.McCuen, 310 Ark. 562, 839 S.W.2d 512 (1992); Newton v.Hall, 196 Ark. 929, *Page 7 120 S.W.2d 364 (1938). It is insufficient if it omits material information that would give the voter serious grounds for reflection. Bailey v. McCuen,318 Ark. 241, 884 S.W.2d 605 (1994).
Finally with respect to compulsion, your proposal prohibits indirect as well as direct compulsion. A voter examining your ballot title could not determine with any degree of certainty what is meant by indirect compulsion, but it is unlikely that a voter would anticipate that the term might encompass so mild an incentive or sanction as the making of a voluntary decision at the peril of losing a benefit, something that might amount to indirect compulsion under some interpretations.
"Participate"
As noted above, the fundamental operative provision of your proposal employs the word "participate" to describe the action that a person is not to be compelled to take. I surmise from the circumstances that the participation envisioned is that of an insured under a health insurance policy. Owing in part, however, to the breadth of your definition of the term "health care system," discussed below, the proposal may effectively repeal any number of laws that compel persons to "participate" in various ways. A person might be said to "participate" in a health care system by paying taxes that support the system, by accepting treatment, or by maintaining a license or permit to engage in a health care-related profession or business. The ballot title therefore fails to sufficiently inform the voter about the effect of your proposed measure because the effects or consequences are not clearly conveyed in the text of the measure itself. Compare Kurrus v. Priest,supra (uncertain language in measure's text resulted in misleading ballot title).
"Compel . . . to Participate"
As noted below, your definition of the term "health care system" is broad and indefinite and likely will include many programs that most voters would consider to be health care systems. Because the words "compel" and "participate" are not defined, your proposal likely would have a broad range of effects, intended or not, upon such health care systems. Such consequences are not described in the ballot title, and the ballot title is therefore materially misleading. Because I question *Page 8 
whether your proposal is actually intended to have the consequences anticipated, I decline to revise the ballot title to disclose them.
Your proposal's likely effects on the Medicaid program are a primary example of possible consequences that are not disclosed in the ballot title, but they are not, as demonstrated below, the only example, nor are the examples referred to in this letter intended to constitute an enumeration of all possible similar undisclosed consequences.
The State of Arkansas imposes certain taxes and fees that are dedicated to provide funding for the Medicaid program.See, e.g., A.C.A. §§ 26-57-904 (Supp. 2009) and -908 (Repl 2008) (soft drink tax), 20-13-212 (Repl. 2005) (ambulance fees). Because the Medicaid program almost certainly comes within the broad definition of "health care system" in your proposal, the measure can be interpreted to relieve persons from the obligation to pay those taxes or fees. In other words, a soft drink consumer or ambulance owner required to pay a tax or fee to support the Medicaid program may be regarded as being compelled to participate in a health care system.
Another example is tobacco taxes levied pursuant to A.C.A. §§ 26-57-1101 to -1102 (Repl. 2008), the proceeds of which are dedicated in part to specified medical research and disease control funds that might well be regarded as health care systems under your definition. See
A.C.A. §§ 26-57-1103, -1106 (Repl. 2008). Proceeds are used, among other things, to "provide screening of women for breast cancer, including mammography, as an early detection health care measure." A.C.A. § 20-15-1304(b)(2)(B) (Repl. 2005).
"Health Care Provider"
The undefined term "health care provider" is impermissibly vague and ambiguous as used in your proposed measure, which uses the term in section 2(a), stating that a health care provider, among others, may not be compelled to participate in a health care system; section 2(b)(2), providing that a health care provider may accept direct payment for certain services; and section 2(c)(1), stating that the proposal does not affect which health care services a health care provider is required to perform or provide. *Page 9 
It is my opinion that the universe of persons who might reasonably be considered to be or not to be health care providers is so vast, varied, and ever-changing that a voter would find it impossible to discern whether it was your intent to cover, or not cover, any particular health care industry participant. In the words of the Arkansas Supreme Court, there is no "established benchmark" upon the basis of which a reasonable voter can sufficiently appreciate the scope and import of his or her vote. Ward v. Priest, supra,350 Ark. at 363-64 (finding that the ballot title fully disclosed that the proposed amendment would abolish taxes on food and medicine as those terms were defined in the amendment, where the definitions of the terms "food" and "medicine" adopted an "established benchmark.")
It is in no way impossible or particularly difficult to define the term. The General Assembly, in enacting the Patient Protection Act of 1995, A.C.A. §§ 23-99-201 to -209 (Repl. 2004, Supp. 2009), provided a clear definition of the term that allows interested parties to determine without question the identities of those providers that are eligible to participate in health benefit plans under the Act. See A.C.A. 23-99-203(d) (Supp. 2009). My cursory examination of the cited statutory definition reveals that acupuncturists and ambulance services are not included (although hospital-based services of any kind, presumably including ambulances, are included). I believe most voters would consider acupuncturists and ambulance services (whose vehicles often carry emergency medical technicians or paramedics as well as patients) to be health care providers. On the other hand, athletic trainers and licensed dieticians are included in the definition. Without intending to denigrate in any way the unquestionably valuable contributions made by athletic trainers and licensed dieticians, I submit that many voters, if asked, would not necessarily characterize persons carrying on those callings as health care providers.
It follows that by failing to provide a definition of this far-reaching and constantly-evolving term, the nature of the issue addressed by your proposal is presented in such a manner as to be impermissibly misleading. See A.C.A. § 7-9-107(c). "HealthCare Services"-"Care"
Your proposal uses the undefined term "health care services" in section 1(b), the definition of the term "health care system"; in section 2(c)(1), providing that the *Page 10 
measure will not "[a]ffect which health care services a health care provider is required to perform or provide"; and in section 2(c)(2), providing that the proposal will not "[a]ffect which health care services are permitted by law." In your definition of the term "lawful health care services," section 1(c) of the proposal, you imply that "health care services" amount to "health-related service[s] or treatment[s]. . . ."
In sections 2(c)(4), (5), and (6), you use the undefined word "care" to describe a thing, allegedly provided pursuant to laws that are specified in those subsections, that is not prohibited by the proposal.
I conclude that, to the extent anything at all was intended, your intent was to establish "care" as a subdivision of the larger universe of "health care services." The plain meaning of the words used, coupled with the implied definition of the term "health care services" contained in the definition of the term "lawful health care services," indicate that "care" encompasses a narrower range of actions that does "health care services," the latter including "service[s]" as well as "treatment[s]."
Accordingly, sections 2(c)(4), (5), and (6) of your proposal are internally ambiguous. By stating that the proposal would not prohibit "care provided pursuant to" the laws specified therein, and by including in the proposal the term "health care services" meaning something broader than "care," your proposal implies that the measure would in fact prohibit "health care services" provided pursuant to the specified laws that do not fall within the narrow sphere of "care." "The phrase expressio unius est exclusioalterius is a fundamental principle of statutory construction that the express designation of one thing may properly be construed to mean the exclusion of another." Macsteel v. Arkansas OklahomaGas Corp., 363 Ark. 22, 31, 210 S.W.3d 878 (2005). Where the text of a proposed initiated measure itself contributes to the confusion and disconnect between the language in the ballot title and the language in the measure, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court. See Roberts v. Priest,341 Ark. 813, 20 S.W.3d 376 (2000).
Once again to illustrate the ambiguity of your proposal, but not to suggest any particular approach should you choose to resubmit a revised proposal, I compare *Page 11 
your use of language to the General Assembly's in enacting the Patient Protection Act of 1995, A.C.A. §§ 23-99-201 to -209. The legislature provided a clear and concise definition of the term "health care services" that allows interested parties to determine the term's meaning without significant doubt and guesswork.See A.C.A. 23-99-203(e).
"Person" — "Individual" — "Businesses" — "Employer"
Your proposal uses the word "person" to describe who may be a provider of lawful health care services (section 1(c)); who may not be compelled to participate in a health care system (section 2(a)); and who may pay directly for lawful health care services (section 2(b)(1)). It uses the word "individual" to describe who must be involved for there to exist a "health care system" as defined in the proposal (section 1(b)). It uses the word "businesses" to describe who may be a provider of lawful health care services (section 1(c)). And it uses the word "employer" to describe who may pay for lawful health care services without the payment being deemed to have been made by a "public or private third party" for purposes of the definition of "direct payment" or "pay directly" (section 1(a)).
You define none of these words, but their use creates several ambiguities.
A lay source defines "person" primarily as an "[i]ndividual human being" and includes an artificial person such as a corporation only in a definition expressly designated as being a legal definition.The Concise Oxford Dictionary of Current English 823-824. The definitions comport with my impression of ordinary usage: laymen generally equate "person" and "human being," while the word "person," as used in a legal document, generally includes artificial persons like corporations. In my view, it is not clear whether your proposal's primary prohibition is intended to apply to artificial persons that are neither employers nor health care providers. This ambiguity is compounded by your use of the word "individuals" in the definition of the term "health care system." "Individuals" unquestionably means "human beings" only, but its use in one section and not another suggests that a different meaning is intended to attach to the word "person," even though the context of section 2(a) suggests that you intend the word "person" to mean "human being." *Page 12 
The word "businesses," as used in common parlance, includes entities, unincorporated associations, and sole proprietorships (that is, individuals carrying on businesses). The word "employer," in my view, includes persons who employ individuals other than in the course of a business. The proposal's use of the word "employer" in the definition of "direct payment" suggests that you intend the word to be interpreted to mean "a person acting in its capacity as an employer," but the word might just as easily mean "any person who is an employer." Hence, payment by an insurance company for health care services provided to an insured might be deemed to be a "direct payment" because the insurance company is an employer as well as an insurer.
"Terms and Conditions"
Your proposal uses in Section 2(c)(3) the undefined phrase "terms and conditions" to describe an aspect of a health care system that will not be affected by the proposed amendment. If your proposal clearly provided, by definition or otherwise, that a "health care system" amounts to coverage under a health insurance policy or the like, the meaning of the phrase "terms and conditions" might be relatively straightforward. In light of the uncertainty, discussed below, surrounding the meaning in your proposal of the term "health care system," however, the provision of section 2(c)(3) can be interpreted to be in direct conflict with section 2(a), the fundamental operative provision of the proposal.
Section 2(a) provides that no law shall compel a person to participate in a health care system. As discussed below, the definition of the term "health care system" is so broad and indefinite that it might include programs, entities, and arrangements that are not commonly considered health care systems. To the extent that the Medicaid program, for example, is a health care system under your proposal's definition, a person's payment of a tax dedicated to finance the Medicaid system would likely be held to be both a term or condition of the applicable health care system and the mechanism to compel the person's participation in such health care system, thus putting sections 2(a) and 2(c)(3) in direct conflict. The conflict reflects a significant ambiguity in your proposal and makes the ballot title inherently misleading. *Page 13 
"Rule"
In common parlance, the word "rule" includes principles of action, conduct, or procedure that are placed into being by persons and entities other than governments, and by the judicial branch of government. Thus an employer might require employees to participate in a health care system as a condition of employment. Or a court might issue a ruling that orders medical treatment for a child whose parents object to the treatment on religious grounds. Because your proposal does not specify whether such rules are intended to be prohibited, it is impossible to formulate a ballot title that fairly and accurately informs voters of its contents.
Defined Words and Terms
"Health Care System"
Your proposal defines the term "health care system" to mean
 any private or government-established, government-created, or government-controlled program whose function or purpose is the management, processing, or enrollment of individuals or payments, in full or in part, for health care services, health care data, or health care information for its participants[.]
Section 1(b).
The term "health care system" is used in the proposal to describe the thing a law may not compel a person to participate in (section 2(a)); and to describe the thing whose terms and conditions the measure does not affect (section 2(c)(3)).
This term and its definition are problematic and ambiguous in at least two ways.
First, the definition does not necessarily cover all systems that commonly would be understood by voters to be health care systems, as that term is used in common parlance. Non-profit and community-owned health care systems, for example, may be neither private nor government-established, government-related, or *Page 14 
government-controlled, yet be universally understood to be health care systems as that term is used in everyday conversation. The undisclosed possible omission of such systems from the operation of the proposed measure makes the ballot title misleading. Because it is impossible for me to determine your intent, if any, with respect to such systems, I cannot revise the ballot title to address this issue.
Second, your definition of the term "health care system" is so broad, indefinite, and ambiguous that it may reasonably be interpreted to include arrangements that are not commonly understood to be health care systems. The possibility of that result is not disclosed in the ballot title, rendering it misleading. Because I cannot determine with any certainty your intent in this respect, I am unable to revise the ballot title and must reject it.
I provide several examples of arrangements, probably not commonly understood to be health care systems, that could reasonably be held to be such within the definition contained in your proposal. Once again, the examples are intended to be illustrative rather than exhaustive.
The Patient Protection Act of 1995, A.C.A. §§ 23-99-201 to -209 (Repl. 2004, Supp. 2009), requires a health care insurer to allow qualified and willing health care providers to participate in the insurer's health benefit plan. See
A.C.A. § 23-99-204(a)(3) (Repl. 2004). Stated another way, the Act compels health care insurers to participate in a health care system that includes any qualified and willing health care provider, rather than in a system that includes only the providers the insurer prefers to include.
An Arkansas statute, A.C.A. § 20-10-1204(a)(5) (Repl. 2005), provides that residents of long-term care facilities may choose their own physicians and pharmacists. Stated another way, the statute compels long-term care facilities to participate in a health care system that prohibits the facilities operators from choosing physicians and pharmacists, rather than a closed system that the operators might prefer.
Health care providers of many types are subject to state licensing and regulatory schemes. Doctors, for instance, must possess a valid medical license in order to practice their profession. See
A.C.A. § 17-95-401 (Repl. 2002). Stated another *Page 15 
way, people who want to practice medicine are compelled to participate in a health care system that requires physicians to be licensed, rather than a system that permits the practice of medicine by all comers.
The State of Arkansas regulates health insurers.See, e.g., A.C.A. § 23-79-114 (Supp. 2009). Part of regulation is the prohibition of practices that might allow an insurer to make more profit but have been determined to be unfair to insureds. Stated another way, health insurance companies desiring to sell insurance in Arkansas are compelled to participate in a regulated health care system rather than the unregulated system they might prefer.
Employers in Arkansas are required to secure the payment of workers' compensation benefits. See
A.C.A. § 11-9-404 (Supp. 2009). Because injured employees receive workers' compensation benefits based on the state of their health, the workers' compensation system might well be held to be a health care system within the definition contained in your proposal. To state employers' obligations in another way, they are compelled to participate in a health care system that includes payments to injured employees, rather than in a system that does not require such payments, which many employers might prefer.
In my opinion, the foregoing examples illustrate clearly that your proposal may have dramatic and far-reaching effects that are not adequately described in the ballot title. Because the intent of the proposal is ambiguous, however, I am unable to summarize such effects.
 "Direct Payment" — "Pay Directly"
Your proposal defines the terms "direct payment" and "pay directly" as
 payment for lawful health care services without a public or private third party, not including an employer, paying for any portion of the lawful health care service[.]
Section 1(a). *Page 16 
Your proposal uses the terms in section 2(b) to describe the nature of payments a person or employer may make, and a health care provider may accept, for lawful health care services.
Your definition and use of the terms is ambiguous in at least two separate respects.
First, your definition provides that a direct payment is not one with respect to which a "public or private third party" pays for any portion of the service, except that if "an employer" pays a portion, the payment is still direct. The definition does not indicate whether a payor who is an employer but is not acting in that capacity in making the partial payment is regarded as an employer for purposes of the direct payment provisions of the proposed measure.
Second, your use of the terms "pay directly" and "direct payment" in sections 2(b)(1) and (2) are ambiguous in that, by stating that a person or employer may pay directly and that a health care provider may accept direct payment, they imply that a person or employer may not pay indirectly, and that a health care provider may not accept indirect payment. Again, the express designation of one thing may be interpreted as the exclusion of another. Macsteel v.Arkansas Oklahoma Gas Corp., supra.
 "Lawful Health Care Services"
Your proposal defines the term "lawful health care services" as
 a health-related service or treatment to the extent that the health-related service or treatment is permitted or not prohibited by law or regulation that may be provided by persons or businesses otherwise permitted to offer such health-related service or treatment.
Your proposal uses the term in sections 1(a) and 2(b)(1) and (2) to designate those services for which direct payments may be made and accepted.
In my opinion, the definition and use of this term create ambiguities because of the proposal's simultaneous use of the undefined term "health care services." A voter *Page 17 
might reasonably question whether the two terms are intended to describe the same or different services.
Additionally, the meaning of the word "otherwise" appearing in the term's definition is unclear. It seems to have no meaning at all, as omission of the word from the definition appears to have no impact on the definition's meaning. The inclusion of a word that may be meaningless is inherently ambiguous.
Section 2(c): Exclusions
This section, which is ambiguous in several respects, provides as follows:
 (c) This amendment does not:
 (1) Affect which health care services a health care provider is required to perform or provide;
 (2) Affect which health care services are permitted by law;
 (3) Affect the terms or conditions of any health care system;
 (4) Prohibit care provided pursuant to Ark. Const., Art. 5, § 32 or the Workers' Compensation Law, Arkansas Code § 11-9-101 et seq.;
 (5) Prohibit care provided pursuant to the ARKids First Program Act, Arkansas Code § 20-77-1101 et seq.; and,
 (6) Prohibit care provided pursuant to the Patient Protection Act, Arkansas Code § 23-99-201 et seq.
In subsection (1), it is not clear, in the vast majority of situations, that health care providers are "required to perform or provide" any health care services at all. If such is the case, the subsection appears to have no potential to have any significant effect and its inclusion, referred to in the ballot title, is misleading in implying that it will have some effect.
Some arrangements commonly understood to be health care systems are named "Health Service." For example, the federal Department of Health and Human Services administers the Indian Health Service for the benefit of American Indians and Alaska natives. To the extent subsection (2) might be interpreted to include some health care systems, subsection (2) contains a false statement, because the proposal clearly affects which health care systems are permitted by law (i.e., only *Page 18 
those that do not involve compelled participation). This ambiguity may cause the summary of subsection (2) in the ballot title to be misleading.
To the extent a rule, term, or condition "of" a health care system is the provision that compels a person to participate therein, subsection (3) contains a false statement, because the proposal clearly would affect, by negating, such rule, term, or condition. The ambiguity may cause the ballot title summary of subsection (3) to mislead voters.
Under the rule of expressio unius est exclusio alterius, discussed above, it is unclear whether your express disclaimer of any prohibition of care provided pursuant to the Workers' Compensation Law is intended to imply that the proposal may have some effect upon related laws such as the Public Employee Workers' Compensation Law, A.C.A. §§ 21-5-601 to -610 (Repl. 2004, Supp. 2009).
In my opinion, subsections (4) and (6) are ambiguous and misleading in that medical care is not literally "provided pursuant to" the laws referred to in those subsections. In other words, the laws listed in the subsections do not provide for medical care. As a result, the sense of the exclusions is unclear. If care is not provided pursuant to a law, what does it mean to say that an enactment will not prohibit care provided pursuant to the law?
Finally, the list comprised of subsections (4), (5), and (6) can be interpreted to be an exclusive enumeration. If the proposal will not prohibit care provided pursuant to the laws listed, one possible implication is that the proposal will in fact prohibit care provided pursuant to some other law not listed, creating ambiguity.
Ambiguities and Misleading Aspects of the Popular Name andBallot Title
Popular Name
As noted above, a popular name must not be misleading or give partisan coloring to the proposal's merit. The cases described below illustrate how the Arkansas Supreme Court applies these prohibitions. *Page 19 
In Arkansas Women's Political Caucus v. Riviere,supra, the court declared invalid a proposal's popular name, "The Unborn Child Amendment." The court stated that "popular ballot names which contain catch phrases or slogans that tend to mislead or give partisan colorings to the merit of a proposal will be rejected." 283 Ark. at 467 (citation omitted). The court discussed three competing schools of thought regarding the time at which life begins and, therefore, the time at which an unborn child exists. It pointed out that the popular name could mislead voters who were of a school of thought not shared by the measure's proponents.Id. at 468. The court criticized the popular name in failing to refer to the proposal's emotionally-charged subject, abortion, and its use of the "inviting catch words `unborn child'." Id.
Noting that few citizens would be inclined to vote against a child, unborn or otherwise, the court characterized the popular name's language as a "clear-cut example of the partisan coloring of ballots which we have uniformly condemned in our decisions holding that a ballot name must be fair and impartial." Id.
In Bradley v. Hall, 220 Ark. 925, 251 S.W.2d 470 (1952), the court rejected the popular name "Modern Consumer Credit Amendment," reasoning that the word "modern" was used as puffery and
 a form of salesmanship, carrying the connotation that the original constitution is old-fogeyish and outmoded, while the proposed amendment is modern and therefore desirable. Even though the popular name need not be as explicit as the ballot title, Pafford v. Hall, 217 Ark. 734, 233 S.W.2d 72, it should not be used as a vehicle for unnecessary praise of the measure. In studying his ballot the voter is not bound by the rule of caveat emptor. He is entitled to form his own conclusions, not to have them presented to him ready-made.
Bradley, 220 Ark. at 929.
Perhaps most relevant here is Moore v. Hall, supra, in which the court rejected the popular name "Freedom to Hire Amendment," saying that
 "Freedom" is an enchanting and bewitching word to every citizen of a democracy. There is some merit in the suggestion that the proposed *Page 20 
popular name might leave the erroneous impression with the voter that by passage of the amendment some new freedom . . . would be brought about. Similar catch phrases and slogans which tend to mislead and to color the merit of a proposal on one side or the other have been rejected, or held fatally defective, by other courts. See Say v. Baker, 137 Colo. 155, 322 P.2d 317; In re Petition of Idaho State Federation of Labor, 75 Idaho 367, 272 P.2d 707.
Moore v. Hall, 229 Ark. 415. See also Crochet v. Priest,326 Ark. 338, 931 S.W.2d 128 (1996) (words "video terminal games," as used in popular name and ballot title was tinged with partisan coloring); Johnson v. Hall,229 Ark. 300, 316 S.W.2d 194 (1958) (popular name "An Amendment Prohibiting Operation of Trains with Unsafe and Inadequate Crews" rejected as partisan); and Jackson v.Clark, 288 Ark. 192, 703 S.W.2d 454 (1986) (Attorney General was correct to substitute other words for "closed-door deal-making" and "influence-peddling" in popular name).
In May v. Daniels, 359 Ark. 100, 29 S.W.3d 669 (2004), on the other hand, the court considered and upheld the popular name "An Amendment Concerning Marriage." The popular name described a proposed amendment that, among other things, defined marriage as consisting "only of the union of one man and one woman."Id. at 103. The court acknowledged the continuing validity of the test in Bradley and Arkansas Women's PoliticalCaucus, but held the popular name to be adequately neutral:
 The popular name . . . clearly and concisely identifies the measure to the voters. It is intelligible, honest, and impartial and does not contain inflammatory language, political catchwords, or partisan coloring. It merely alerts the voters to the subject on which they will be voting, without attempting to influence them one way or the other. Contrary to Petitioners' urging, we do not believe that the term "marriage" evokes the same type of emotional reaction as the phrase "unborn child."
May, 359 Ark. at 106. *Page 21 
In my opinion, your proposal's popular name is both tainted by partisan coloring and misleading. In my view, and as the court implied in Moore v. Hall, supra, few if any voters would be opposed, in the abstract, to "freedom of choice" in the health care area or in most any other context. The popular name therefore employs "inviting catch words" in an impermissible attempt to influence voters to support the measure. It presents a ready-made conclusion to the voter, rather than relying upon the voter to reach an independent determination.
It is also my opinion that the popular name, in purporting to provide freedom of choice, is misleading in multiple respects.
First, it falsely implies that there are not already meaningful ranges of alternatives in the markets for individual (non-group) health insurance coverage, and for group health insurance coverage (from the perspective of a purchaser, like an employer, who will offer participation in the group to others, like employees). It is my understanding that purchasers in both the markets identified have a significant range of options now.
Second, the popular name is misleading in falsely implying that the measure might require employers to offer a range of alternatives in employee-benefit health insurance. It is my understanding that many, perhaps most, employers that offer employee health insurance benefits offer a single plan on a take-it-or-leave-it basis, and that nothing in the proposed measure would alter that situation.
Third, the popular name is misleading in falsely implying that out-of-network cost differentials might be eliminated. It is my understanding that in many health insurance arrangements, particularly HMOs and PPOs, insured patients pay a different amount for the same care depending on whether they use an in-network health care provider. I expect that many insured people regard this cost differential as the most significant practical restraint on their ability to choose freely among health care providers and therefore would become mindful of the differential when presented with your popular name.
Fourth, the proposed popular name is misleading inasmuch as it falsely implies that the measure itself creates new options in obtaining health care. The proposed measure, if adopted, would create no new options. *Page 22 
Fifth, it is my opinion that the popular name's use of the word "choice" could mislead voters into thinking that the proposed measure somehow concerns abortion. I observe that the word "choice" has been used extensively by most or all factions in our society's long-running and contentious debate over abortion. A popular name that employs the word "choice" could evoke responses that have nothing to do with participation in health care systems.
Ballot Title
Ambiguous Text
In my opinion, the second and third sentences of your ballot title are impermissibly confusing, misleading, and ambiguous.
The sentences are: "A person or employer may pay directly for lawful health care services. A health care provider may accept direct payment for lawful health care services."
The sentences are flat statements of simple fact and law that are accurate in most, perhaps all, circumstances. They do not, however, purport to describe in any way the proposed measure's impact. A voter reading the sentences is left to wonder whether adoption of the measure would create direct payment rights, abolish direct payment rights that theretofore existed, or make no change in the state of the law. The ballot title is therefore deficient in this respect. The voter must be able to understand the consequences of his or her vote based on the ballot title, see Bradley v.Hall, supra. As the court explained in Bradley:
 It is evident that before determining the sufficiency of the present ballot title we must first ascertain what changes in the law would be brought about by the adoption of the proposed amendment. For the elector, in voting upon a constitutional amendment, is simply making a choice between retention of the existing law and the substitution of something new. It is the function of the ballot title to provide information concerning the choice that he is called upon to make. Hence the adequacy of the title is directly related to the degree *Page 23 
to which it enlightens the voter with reference to the changes that be is given the opportunity of approving.
220 Ark. at 927.
The two sentences quoted above fail utterly to explain how the law is proposed to be changed, if at all, and as such are ambiguous and misleading.
Required Disclosure
As stated in Op. Att'y Gen. 2010-013, the Constitution of the United States provides that it, and "the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this provision, known as the Supremacy Clause, state laws that "`interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." WisconsinPublic Intervenor v. Mortier, 501 U.S. 597, 604 (1991), quotingGibbons v. Ogden, 9 Wheat. 1, 211 (1824) (Marshall, C.J.).
While your proposal does not specify the law(s) whose operation it is intended to block, I believe practically all voters who are even moderately well-informed will anticipate that your proposal is primarily or exclusively intended to prevent the application within Arkansas of the individual mandate to maintain health insurance coverage contained in section 1501 of the Patient Protection and Affordable Care Act, Pub.L. No. 111-148, 124 Stat. 119 (the "PPAC Act").[2] *Page 24 
Because the individual mandate affirmatively requires people to maintain health insurance coverage, and your proposal purports to make ineffective any law that requires individuals to maintain health insurance coverage, your proposal is in direct and irreconcilable conflict with federal law[3] and will be invalid under the Supremacy Clause, to the extent the individual mandate of the PPAC Act is valid.
The validity of the individual mandate therefore appears to be an issue here. Some maintain that the individual mandate is indeed beyond the authority of Congress to *Page 25 
act, and is invalid. It will be upheld, however, if properly founded upon a Congressional power enumerated in the Constitution.
Among these powers is that set forth in the Commerce Clause,U.S. Const. art. I, § 8, cl. 3, which authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." In support of its authority to act pursuant to this provision, Congress has expressly justified the individual mandate as based both upon the inherent condition of insurance as interstate commerce and upon the substantial effect of health insurance on interstate commerce.[4]
Congressional authority to undertake such legislation has further been defended as arising from the Taxing and Spending Clause of the Constitution, U.S. Const. art I, § 8, which provides that "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States. . . ." At its core, reliance upon the Taxing and Spending Clause as justifying the individual mandate appears to rest upon the proposition that the penalties for noncompliance with the individual mandate constitute a tax that will serve the public's general welfare in promoting the cause of universally available health care.[5] *Page 26 
I will not here conduct a detailed inquiry into the relative merits of the arguments relating to the power of Congress to enact federal health-care regulation, including the individual mandate. I merely note that the ultimate resolution of this debate will almost certainly occur in the United States Supreme Court and will determine whether any decision regarding the imposition of an individual mandate might be made by Congress or is necessarily reserved to the states under the Tenth Amendment to the United States Constitution.[6]
Pending any such ultimate resolution of the issue, however, I am constrained to afford the PPAC Act, including the individual mandate, a presumption of validity:
 In enacting . . . legislation Congress has affirmed its validity. That determination must be given great weight; this Court by an unbroken line of decisions having "steadily adhered to the rule that every possible presumption is in favor of the validity of an act until overcome beyond rational doubt." Adkins v. Children's Hospital, 261 U.S. 525, 544.[7]
Everard's Breweries v. Day, 265 U.S. 545, 560 (1924).
Affording the PPAC Act, including the individual mandate, a presumption of validity, as I must, it becomes apparent that your proposed measure, if adopted, will be invalid under the Supremacy Clause. Accordingly, as stated in Op. Att'y Gen. 2010-013, you must disclose in the ballot title that the Supremacy Clause will prevent the proposal from affecting the application in Arkansas of any valid, preemptive federal law, such as the individual mandate of the PPAC Act. *Page 27 
You should also consider including disclosure concerning the absence of impact your proposal will have in the event the individual mandate is ultimately held to be invalid. If the individual mandate is invalid, it will not be because of the enactment of your proposal; it will instead be because the individual mandate is held to be beyond the constitutional powers of Congress to legislate. Accordingly, your proposal can never be both valid and effectual.
I will attempt to illustrate my point: Assume that a federal law requires residents to maintain health insurance policies that include coverage of dependent children through at least age 25. Assume that a state law requires residents to maintain health insurance policies that include coverage of dependent children through at least age 23. If, in a constitutional challenge, the federal law is held to be valid and of preemptive effect, the state law will be invalid due to the Supremacy Clause and state residents will be required to maintain dependent children coverage through age 25. If, on the other hand, the federal law is held to be invalid or not of preemptive effect, the state law will be valid and state residents will be required to maintain dependent children coverage through age 23. In other words, if the federal law is invalid, the state law will take and have an independent effect.
Contrast the foregoing example with the case of your proposal. A federal law, the PPAC Act, requires residents to maintain health insurance coverage. Your proposal purports to negate that federal requirement. If, in a constitutional challenge, the federal law is held to be valid and of preemptive effect, your proposal will be invalid under the Supremacy Clause and state residents will be required to maintain health insurance coverage. If, on the other hand, the PPAC Act's individual mandate is held to be invalid, it will be struck down because enactment of the individual mandate is beyond the enumerated powers of Congress discussed above, not because of anything in your proposal. Stated another way, your proposal will be either invalid or ineffective. Under no set of circumstances will your proposal have any legal impact on whether the PPAC Act's individual mandate will be binding upon Arkansas residents.
To summarize, your measure misleadingly implies that the state, presumably in the exercise of powers retained under theTenth Amendment, may forbid the enactment or operation of a valid preemptive federal law. As stated above and in Op. Att'y Gen. 2010-013, you must disclose in the ballot title that the Supremacy *Page 28 
Clause will prevent your proposal from affecting the application in Arkansas of any preemptive federal law, including without limitation the PPAC Act's individual mandate, that is ultimately held to be valid. Because federal legislation is presumed to be valid, such disclosure may be sufficient. Pursuant to the foregoing discussion, however, you should also consider whether to disclose in the ballot title that in the event the PPAC Act's individual mandate is ultimately without effect in Arkansas, it will not be because of the adoption or rejection of your proposal.
My review of your proposed measure raises questions about the limits of the people's authority to legislate directly. Decisions of the Arkansas Supreme Court make clear that a proposed measure that is "clearly contrary" to law is not permitted to appear on the ballot. Kurrus v. Priest, supra; Donovan v. Priest, supra; andPlugge v. McCuen, supra. In such a case of clear invalidity, "`the measure's proponents are [not] entitled to invoke the direct legislation process at all.'" Kurrus v. Priest,342 Ark. at 448, quoting Stilley v. Henson,342 Ark. 346, 351, quoting in turn Donovan v. Priest,326 Ark at 359.
Justice Dudley explained the limits of the people's power to legislate directly:
 All power inheres in the people, but the people may not exercise all power. The will of the majority must prevail, but only if it is within the balances and limitations of the Constitution. The majority is a true sovereign, but only when held in check by those balances and limitations. It is a dualism that is institutionalized in our constitutional structure, for as the American Constitution was the first in history to incorporate the principle that men make government and that all government derives its authority from consent, it was also the first to place effective limits on government. See, Henry Steele Commager, Commager On Tocqueville 21-22 (1993).
 This paradox inherent in our democracy is carried an additional step in our system of federalism. The people of a state are to be governed by the will of the majority, but that will is held in check by balances and limitations of both the United States and the state constitutions. While article 2, section 1 of the Arkansas Constitution provides that "[a]ll political power *Page 29 
is inherent in the people and government [and] is instituted for their protection, security and benefit; and they have the right to alter, reform or abolish the same in such manner as they may think proper," the provision is limited by both constitutions.
Christian Civic Action Committee v. McCuen,318 Ark. 241, 258-259, 884 S.W.2d 605 (1994) (Dudley, J., dissenting).
Pursuant to the provisions of Ark. Const. art. 5, § 1 ("Amendment 7"), the General Assembly has enacted a statute requiring the Secretary of State, "after consultation with the Attorney General," to decide, upon the submission of a petition, whether a proposed measure, "if subsequently adopted by the electorate, would violate any state constitutional provision or any federal constitutional, statutory, or regulatory provision or would be invalid for any other reason." Ark. Code Ann. § 7-9-503(b) (Repl. 2007). In my opinion, the statute is clear evidence of legislative intent, consistent with the rules set forth in Kurrus and similar cases described above, that initiated proposals that are clearly contrary to law cannot appear on the ballot.
Because I am not squarely faced with the question here, your proposal having clear prospective application to state law, I will not state an opinion on the question of certifying a revised proposal that clearly purports to apply only to a preemptive federal law.
Conclusion
My office, in the certification of ballot titles and popular names, does not concern itself with the philosophy or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied in A.C.A. § 7-9-107 and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law.See, e.g., Finn v. McCuen,303 Ark. 418, 793 S.W.2d 34 (1990). *Page 30 
Furthermore, as indicated above, the Court has confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v.Priest, supra. The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id. Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed popular name and ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure, popular name and ballot title. See A.C.A. § 7-9-107(c). You may, after clarification of the matters discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. As noted above, some changes or additions to your submitted popular name and ballot title will be necessary. I will perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
DUSTIN McDANIEL Attorney General
DM:cyh
Enclosure
[1] Although a cover letter indicates that your proposal is intended to be a constitutional amendment, it is not clear from the text of the proposal itself whether the measure is intended to be a constitutional amendment or an initiated act. Please note in this regard that you are required, pursuant to A.C.A. § 7-9-107(a), to submit the "original draft" of the petition to my office. The petition must be on substantially the form set forth in A.C.A. § 7-9-104 (Repl. 2007), which includes language identifying the measure as an "amendment to the Constitution of the State or law or ordinance. . . ." It is critical, in my view, that the voters have a clear understanding of the precise nature of the amendment. Because your petition is not clear in this respect, I will refer simply to your proposed "measure" throughout this opinion.
[2] While I suspect that the proposal is intended to interfere only with the individual mandate, it is apparent that the proposal, as currently drafted, could easily be interpreted to affect rights and responsibilities under other federal laws. For example, Medicare is financed at least in part by a dedicated tax on employee earnings. To the extent a wage earner's payment of such taxes amounts to compelled participation in the Medicare program, your proposal would purport to excuse the obligation to pay the taxes. A similar argument might be made with respect to FICA taxes to finance Social Security disability payments, which are made on the basis of the state of a person's health and therefore might be interpreted to be part of a health care system. These two examples are by no means an exhaustive list of the federal programs that your proposal might be interpreted to come into conflict with. I do not pursue this line further here because I expect you may narrow upon any resubmission your proposal's potential application to federal law.
[3] With respect to the issue of preemption, the United States Supreme Court declared as follows in Crosby v.National Foreign Trade Council, 530 U.S. 363, 372-73 (2000):
 A fundamental principle of the Constitution is that Congress has the power to preempt state law. Art. VI, cl. 2; Gibbons v. Ogden, 9 Wheat. 1, 211 (1824); Savage v. Jones, 225 U.S. 501, 533 (1912); California v. ARC America Corp., 490 U.S. 93, 101 (1989). Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances. When Congress intends federal law to "occupy the field," state law in that area is preempted. Id., at 100; cf. United States v. Locke, 529 U.S. 89, 115 (2000) (citing Charleston Western Carolina R. Co. v. Varnville Furniture Co., 237 U.S. 597, 604 (1915)). And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. Hines v. Davidowitz, 312 U.S. 52, 66-67 (1941); ARC America Corp., supra, at 100-101; Locke, supra, at 109. We will find preemption where it is impossible for a private party to comply with both state and federal law, see, e.g., Florida Lime Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, supra, at 67. What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects:
 "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished — — if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect — the state law must yield to the regulation of Congress within the sphere of its delegated power." Savage, supra, at 533, quoted in Hines, supra, at 67, n. 20.
(Footnote omitted.)
[4] Specifically, in section 1501 of the health-care package, Congress recited a series of factual findings in support of the conclusion that "[t]he individual responsibility requirement provided for in this section . . . is commercial and economic in nature and substantially affects interstate commerce. . . ." (Emphasis added.) Subsection (a)(3) of Congress' "Findings" further provides:
 SUPREME COURT RULING. — In United States v. South-Eastern Underwriters Association
(322 U.S. 533 (1944)), the Supreme Court of the United States ruled that insurance is interstate commerce subject to Federal regulation.
(Emphasis added.)
[5] For an instructive summary of the current debate regarding the applicability of these two constitutional provisions as justification for the federal health-care package, see Jennifer Staman Cynthia Brougher, Requiring Individuals to Obtain HealthInsurance: A Constitutional Analysis, Congressional Research Service (July 24, 2009); Mark A. Hall, Legal Solutions in HealthReform: The Constitutionality of Mandates to Purchase HealthInsurance, Based upon what I consider a thorough review of legal precedent, Professor Hall concludes that the courts would probably not sustain a challenge to the federal health-care package.
[6] The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."U.S. Const. amend. X. The United States has characterized this provision as merely expressing the "truism that all is retained which has not been surrendered," United States v. Darby,312 U.S. 100, 124 (1941) — i.e., that any power not ceded to Congress by enumeration in the Constitution continues to reside in the states.
[7] Although the holding in Adkins was subsequently overruled, West Coast Hotel Co. v. Parrish,300 U.S. 379, 397-400 (1937) (sustaining a Washington statute authorizing the fixing of minimum wages for women and minors), the principle echoed in Everard's has not been abandoned.

 *Page 1